UNITED STATES of America, Plaintiff-Appellant,

v.

Allen WAUNEKA, Defendant-Appellee.

No. 84–1236.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 11, 1985.

Decided Sept. 10, 1985.

Sherry P. Herrgott, Phoenix, Ariz., for plaintiff-appellant.

Thomas Hoidal, Phoenix, Ariz., for defendant-appellee.

Before HUG, SCHROEDER and HALL, Circuit Judges.

HUG, Circuit Judge:

Appellee Allen Wauneka ("Wauneka") was charged with several counts of assault and rape stemming from two separate assaults on female nurses in Fort Defiance, Arizona. Wauneka moved to suppress all statements made by him to law enforcement officials on January 20 and 22, 1984, on the grounds that his initial confession was the product of questioning by the police not preceded by the warnings required in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that the subsequent statements were not sufficiently attenuated from the earlier confession and were, therefore, tainted by the earlier confession. The district court suppressed those statements made by Wauneka pertaining to the December 16, 1983 attack on one of the nurses and ruled that Wauneka's confessions to the January 11, 1984 shooting of the other nurse were admissible. The Government appeals the district court's pretrial suppression order pursuant to 18 U.S.C. § 3731 (1982). In light of the United States Supreme Court's decision in *Oregon v. Elstad*, — U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the district court's pretrial suppression order is reversed and the case is remanded for further proceedings consistent with this opinion.

## FACTS

On December 16, 1983, Ruth Minton, a nurse of the Public Health Service Hospital in Fort Defiance, Arizona, was attacked, raped, and stabbed in the throat. On January 11, 1984, Anita Willard, a nurse employed at the same hospital, was shot in the head through the back window of her home with a .22 caliber rifle. Both victims survived.

On January 17, 1984, Bureau of Indian Affairs ("BIA") officers, patrolling the hospital grounds as part of the investigation of the attacks, questioned four young men in the hospital parking lot, one of whom was Wauneka. On January 19, 1984, two BIA investigators visited Wauneka and asked him to come to the BIA office. Wauneka consented and was accompanied by a friend, Franklin Begay.

During this first interview, the BIA officials obtained descriptive data from Wauneka. Wauneka was informed that he was not being accused of any crime, but that the procedure was routine. The BIA officials asked Wauneka why he was on the hospital grounds on the night of January 17, 1984. Wauneka was photographed by the officials for the purpose of future photographic identifications.

While waiting for Mr. Begay to be interviewed, BIA Chief Inspector Bill King questioned Wauneka about the rape of a woman whose last name was also Wauneka. Inspector King further inquired whether Wauneka heard about the stabbing and rape of Ruth Minton. Wauneka replied that he had and volunteered that he knew about the shooting of Anita Willard. Wauneka explained that on the night of the Willard shooting, he was walking in the vicinity of the Willard residence, heard a shot, and saw a man run down a nearby ravine. Wauneka was advised that this information would be forwarded to the Federal Bureau of Investigation ("FBI") and that Wauneka would be questioned later. Before returning Wauneka and Begay to their residence, the BIA investigators took them to the scene of the Willard shooting, where Wauneka pointed out his position on the night of the shooting.

On January 20, 1984, following further investigation, Wauneka was asked to return to the BIA office for additional questioning concerning his statements to Inspector King. BIA officials picked up Wauneka at his residence and drove him to the BIA office. During this second interview, Wauneka identified the man he saw as "Francisco." Wauneka accompanied an official to the shooting scene to measure distances, completed a written statement of his account of the shooting and was returned to his residence. This second interview lasted approximately two hours.

At approximately 7:00 p.m. that same day, two uniformed and armed officers arrived at Wauneka's residence, advised Wauneka that he was needed for further questioning and transported him to the BIA office. As in the prior interviews, Wauneka was again questioned in the BIA's conference room. Present during this third interview were Wauneka, FBI agent Romero, and four BIA investigators. When confronted with the fact that the information he had earlier given was not confirmed, Wauneka admitted that he did not know a "Francisco" and that his written statement was false. Instead, Wauneka said that on the night of the January 11 shooting, he was driving a vehicle, accompanied by two friends, when an ambulance came up behind them and proceeded to the scene of the shooting. Wauneka continued to his residence, parked his car, and walked back to where the ambulance had stopped. Wauneka stated that while he was standing there, he observed a man with a gun. However, Wauneka later recanted this statement and returned to his original version of what happened.

Wauneka was then advised by the law enforcement officials that he knew information which only the perpetrator, an eyewitness to the crime, or an investigator would know, and that his description matched the description of the assailant provided by Ruth Minton. Wauneka denied that he was involved in either offense. The interview lasted approximately one hour. A break was taken when FBI agent Zembiec arrived.

During the break, Wauneka was placed in another office with BIA investigator Hart, who apparently warned Wauneka to "come up with another name because he could get fifteen years for lying to the FBI." Wauneka broke down and cried.

Wauneka's interview resumed at approximately 8:20 p.m., but only Wauneka and FBI agents Zembiec and Romero were present. Agent Zembiec spoke at some length of the seriousness of the crimes, the adverse impact on the community if the hospital were forced to close, and the importance of Wauneka's assistance in the investigation. Agent Zembiec asked Wauneka if he had raped a nurse at Fort Defiance on December 16, 1983. Wauneka nodded his head, and then said "yes." Agent Zembiec asked Wauneka what he had been wearing at the time of the rape. In reply, Wauneka patted his head with his hand and said, "stocking cap."

Immediately thereafter, Wauneka was orally advised of his *Miranda* rights. Wauneka responded that he understood his rights. The agents told Wauneka that he could stay or leave, that the door was not locked, that he could leave at any time, and that he could talk or remain silent. Wauneka remained and confessed to the rape and stabbing of Ruth Minton and to the shooting of Anita Willard. The confessions were completed by 10:00 p.m. Wauneka then signed a written waiver of rights form reflecting the earlier oral advice of rights and his waiver.

Afterwards, Wauneka was taken to a nearby trash dump, where he had apparently disposed of the rifle used in the Willard shooting. The rifle was not located. The investigators took Wauneka to his residence, where he produced the tennis shoes that he wore on both nights. On returning to the BIA office, Wauneka was placed under arrest. Wauneka was transported to a jail in Gallup, New Mexico and remained there during the next day, Saturday, January 21, 1984. On January 22, 1984, Wauneka was transported to Flagstaff, Arizona. On this same day, Wauneka made additional statements pertaining to the rape and shooting. On January 23, 1984, Wauneka appeared before the United States Magistrate in Flagstaff, Arizona.

The district court conducted a four-day hearing on Wauneka's motion to suppress and concluded that prior to any *Miranda* warning Wauneka was the subject of a custodial interrogation on January 20, 1984 at the time he was asked whether he had raped a nurse at Fort Defiance. The district court further found that once advised of his *Miranda* rights, Wauneka voluntarily, knowingly, and intelligently waived his

rights. Despite the finding of waiver, the district court suppressed Wauneka's subsequent statement regarding the rape of Ruth Minton because it was tainted by the earlier unwarned confessions to that crime. However, Wauneka's January 20, 1984 admission of guilt to the shooting of Anita Willard was found to be voluntary, untainted, and admissible.

With respect to Wauneka's confessions of January 22, 1984, the district court found that Wauneka was properly advised of his rights and knowingly and voluntarily waived them. However, the failure to advise Wauneka of his *Miranda* rights prior to his January 20 confession to the rape, the district court ruled, required suppression of the January 22, 1984 confession to the rape. The district court noted that the passage of time and the second *Miranda* warning were not sufficient to dissipate the taint of the earlier unlawful confession. Wauneka's January 22, 1984 confession to the Willard shooting was found to be free of this taint and voluntary.

## DISCUSSION

### I. *Custodial Interrogation*

The Government contends that the district court erred in concluding that Wauneka was subjected to "custodial interrogation" when he responded affirmatively to FBI agent Zembiec's question on January 20, 1984 whether he, Wauneka, raped a nurse at Fort Defiance and described the clothing he was wearing that night. Because no *Miranda* warnings had been given prior to this custodial interrogation, the district court suppressed Wauneka's answers.

■■■ The procedural protections afforded by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), are designed to secure an accused's privilege against self-incrimination and are triggered only in the event of a custodial interrogation. A defendant is in custody when, based upon a review of all the pertinent facts, "a reasonable innocent person in such circumstances would conclude that af-

ter brief questioning he or she would not be free to leave." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981). Pertinent factors to be considered include (1) the language used to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the detention, and (5) the degree of pressure applied to detain the individual. *United States v. Crisco*, 725 F.2d 1228, 1231 (9th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984); *Booth*, 669 F.2d at 1235; *United States v. Curtis*, 568 F.2d 643, 646 (9th Cir.1978). "[I]nterrogation may be 'either express questioning or its functional equivalent,' and ... include[s] any statements or actions 'that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Booth*, 669 F.2d at 1237 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980)).

■■■ Whether a defendant was the focus of a custodial interrogation is a factual determination that must be made on a case-by-case basis. *Crisco*, 725 F.2d at 1230 (citing *Booth*, 669 F.2d at 1237–38). A district court's findings on this issue are essentially factual and are reviewable pursuant to the clearly erroneous standard. *See United States v. McConney*, 728 F.2d 1195 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

■■■ Wauneka was obviously subjected to an interrogation when he was asked whether he raped a nurse at Fort Defiance. We next consider whether Wauneka was in custody on January 20, 1984 at the time of his inculpatory statement. Wauneka was questioned by law enforcement officials on four occasions, three times on January 20. On the first three, he was transported from his residence to the BIA office by plain clothes agents. When he was picked up the last time on the evening of the 20th for further questioning, Wauneka was transported by two armed officers and was placed in a large conference room with four or five officers who each had an opportuni-

ty to question him. The questioning progressed for over an hour and turned accusatory—Wauneka was told that he supplied information that only a perpetrator would know, that he matched the description of the rapist, and that he had better tell the truth. During a break, Wauneka, who was then eighteen years old, broke down crying. The FBI agents resumed the questioning despite the fact that Wauneka was visibly shaken by this ordeal. Wauneka had no means of transportation, and he was never offered an opportunity to leave the BIA office prior to his confession. A reasonable innocent person in such circumstances probably would have concluded that he was not free to leave. *See United States v. Lee*, 699 F.2d 466, 468 (9th Cir. 1982). Viewed in totality, the district court's finding that Wauneka was subjected to a custodial interrogation was adequately supported by the record.

## II. *Admission of Wauneka's Confessions*

*Elstad*, which was decided after the ruling by the district court and during the pendency of this appeal, clarifies those instances when a confession, preceded by an unwarned admission of guilt and the *Miranda* warning, may be admissible against the defendant. In *Elstad*, the defendant was initially questioned by a police officer at his parents' residence. When the police officer stated his belief that the defendant was involved in the burglary of a neighbor's home, the defendant blurted out, "Yes, I was there." The defendant was transported to sheriff's headquarters, where, approximately one hour later, the officers advised the defendant for the first time of his *Miranda* rights. The defendant indicated that he understood his rights and wished to speak to the officers, whereupon he signed a full confession.

At trial, the defendant moved to suppress his oral statement and signed confession. The trial judge ruled that the statement, "I was there," had to be excluded because Elstad had not been advised of his *Miranda* rights, but that the written confession was admissible. The Oregon Court of Appeals reversed the conviction, holding that the first, unconstitutionally obtained oral statement tainted the later, written confession and rendered it inadmissible. The Oregon court reasoned that "the coercive impact of the unconstitutionally obtained statement remains, because in a defendant's mind it has sealed his fate.... The cat was sufficiently out of the bag to exert a coercive impact on defendant's later admissions." *Oregon v. Elstad*, 61 Or. App. 673, 677–78, 658 P.2d 552, 554–55 (1983).

The United States Supreme Court granted certiorari to consider the question whether "the Self-Incrimination Clause of the Fifth Amendment requires the suppression of the confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." *Elstad*, 105 S.Ct. at 1290. The Supreme Court rejected the psychological analysis urged by the Oregon court and ruled that the fifth amendment did not require suppression in such an instance.

The Supreme Court reemphasized that a statement given in response to interrogation while in custody prior to the warning required by *Miranda* must be excluded from evidence at the trial of the Government's case in chief. The Supreme Court reasoned that the required *Miranda* warning is a prophylactic device to better assure the protection of fifth amendment rights even though there may not have been actual coercion that would require the exclusion of the statement on constitutional grounds. The Supreme Court declined to treat the lack of a *Miranda* warning as equivalent to actual coercion, in the constitutional sense, when applied to subsequent statements given after a *Miranda* warning. Thus, the Supreme Court did not apply the "taint" analysis of *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), to determine whether the violation of the defendant's constitutional rights so tainted the acquisition of the subsequent statement as to require exclusion. The Su-

preme Court found the prior statement by Elstad to have been voluntary, not coerced, even though technically obtained in violation of the prophylactic rule of *Miranda.* Thus, the Supreme Court reasoned that since there had been no actual coercion such as to violate the fifth amendment, the focus of the inquiry concerning the admissibility of the subsequent statement after the *Miranda* warning should be on whether the subsequent statement was made voluntarily rather than on the "taint" analysis required by *Brown.* The Supreme Court stated:

> *Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made.* As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. *We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.*

*Elstad,* 105 S.Ct. at 1298 (footnote omitted; emphasis added).

■ Under the Supreme Court's analysis in *Elstad,* in determining the admissibility of a defendant's statement given after the *Miranda* warning, the court should look first to determine whether the statement made by a defendant before the *Miranda* warning was actually coerced in violation of the fifth amendment. If it was, then the court must suppress the evidence unless the violation was sufficiently attenuated to permit the use of the evidence under the standards announced in *Brown.* If, on the other hand, the prior statement was voluntary in the sense that it was not coerced in violation of the fifth amendment, though obtained in technical violation of the *Miranda* requirements, the court should suppress the statement given after the *Miranda* warning only if the court finds that the subsequent statement was not voluntarily made. This decision would take into consideration the surrounding circumstances, the combined effect of the entire course of the officer's conduct upon the defendant, including the effect of his previously having made a confession, and the manner in which the officers utilized this prior confession in obtaining a second confession.

We reverse and vacate the pretrial suppression order of the district court and remand for a determination of admissibility consistent with the *Elstad* decision. As a threshold matter, the trial court must determine whether Wauneka's initial oral, unwarned *Miranda* confession to the December rape was voluntary or coerced. If the trial court concludes that the initial admission of guilt was voluntary, it "must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his [subsequent] statements." *Id.* at 1298. Merely because the initial confession was itself voluntary does not render the latter admission of guilt voluntary. This inquiry into the facts and circumstances surrounding the second confession necessarily encompasses an evaluation of several factors: the time lapse between the initial confession and the subsequent statements; Wauneka's contacts, if any, with friends or family members during that period of time; the degree of police influence exerted over Wauneka; whether Wauneka was advised that his prior admission could not be used against him; or whether, as

was the case in *United States v. Johnson*, 626 F.2d 753, 759 (9th Cir.1980), *aff'd*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), Wauneka was told that his previous remarks could be used against him. No one factor in isolation will be determinative. Rather, the totality of all the circumstances surrounding Wauneka's detention, the interviews, and the police conduct, will determine whether the latter confessions are admissible against Wauneka.

■ Alternatively, the trial court may conclude that Wauneka's initial oral, unwarned confession was the product of coercive police tactics. Wauneka's subsequent confessions must therefore be suppressed unless they were sufficiently attenuated from his initial admission of guilt so as to dissipate its taint. In evaluating whether the subsequent confession is sufficiently attenuated from the previous illegal interrogation, the trial court will be guided by the three factors delineated in *Brown:* (1) the temporal proximity of the statements and the unconstitutional activity; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62. *See also Johnson*, 626 F.2d at 758, *aff'd* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982).

If, under the *Brown* analysis, the district court concludes that Wauneka's initial confession to the December rape taints either all or portions of Wauneka's subsequent confessions, despite the advice of the *Miranda* warnings, they must be excluded.

### III. *Retroactive Application of Elstad*

■ A question remains as to whether the Supreme Court's ruling in *Elstad* applies retroactively to this appeal, a case that was pending and undecided on appeal at the time the Supreme Court's decision was rendered. In the fifth amendment context, the Supreme Court has previously ruled that *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981),[1]

is to be given retroactive application in pending and undecided direct reviews of a judgment of conviction, *Shea v. Louisiana*, —— U.S. ——, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985), but not in actions seeking federal habeas corpus relief from a state conviction that has become final. *Solem v. Stumes*, 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984).

For the reasons enunciated in *Shea*, we apply *Elstad* retroactively. There is no difference between the situation confronting Elstad and that faced by the appellee Wauneka. The Government's appeal is not a collateral attack on a criminal conviction that is now final, but is a direct review of a judgment deemed final pursuant to 18 U.S.C. § 3731. And, the rule announced in *Elstad* is not a clear break with past, prior precedents, which would preclude retroactive application, but is an application of *Miranda* principles to a particular situation. The application of *Elstad* to the instant action is proper.

### CONCLUSION

We affirm the district court's finding that Wauneka was the subject of a custodial interrogation on January 20, 1984. We reverse and remand this action for further proceedings not inconsistent with this decision.

REVERSED and REMANDED.

---

1. In *Edwards,* the Supreme Court ruled that once a suspect has invoked his right to counsel, further interrogation in a counsel's absence is forbidden unless the suspect institutes the conversation with the officers.