485 So.2d 462 (1986)
The STATE of Florida, Appellant,
v.
Jorge MADRUGA-JIMINEZ, Appellee.
No. 84-1845.
District Court of Appeal of Florida, Third District.
March 11, 1986.
Rehearing Denied April 14, 1986.
*463 Jim Smith, Atty. Gen., and Richard Polin, Asst. Atty. Gen., for appellant.
Bennett H. Brummer, Public Defender, and Howard K. Blumberg, Asst. Public Defender, for appellee.
Before BARKDULL, HUBBART and NESBITT, JJ.
NESBITT, Judge.
On September 26, 1983, Officer Fernandez obtained a warrant for the arrest of Madruga-Jiminez on a charge of first degree murder for the killing of Juan de la Cruz Merlo. At about 9:30 a.m. on September 29, Officer Fernandez, with the warrant in his possession, went to a Hialeah location where he expected to find the defendant working. Officer Fernandez located Madruga-Jiminez and transported him to the police station for questioning.[1] They arrived at the police station at approximately 10:30 a.m. From that time until approximately 12:10 p.m. Officer Fernandez conducted, without giving the defendant Miranda warnings, what the state has characterized as a "background interview."
The interview consisted of a probe into the defendant's personal history, including his trip from Cuba to the United States and his employment history. Officer Fernandez testified that the purpose of the background interview "was to set [Madruga-Jiminez] at ease and gain his confidence." Officer Fernandez had information, when he began the interview, which indicated that Madruga-Jiminez had come from Cuba with another individual who was a suspect in the murder. He had also learned, prior to the interview, that the defendant had once worked for the victim. During the *464 interview, Madruga-Jiminez confirmed both of those facts. In particular, when the employment with Merlo came up, Madruga-Jiminez said, "That's what you want to talk to me about, isn't it?" at which point Officer Fernandez responded, "We'll get back to that."
After more than an hour and a half of interrogation, Officer Fernandez informed Madruga-Jiminez that he was under arrest for murder and read him his Miranda rights. Madruga-Jiminez executed a written waiver at approximately 12:15 p.m. Officer Fernandez then began to question the defendant about his activities on the day Merlo was killed.[2] At about 2:45 p.m. Madruga-Jiminez admitted killing Merlo. The questioning continued for another hour before a break was taken.
The questioning resumed at 4:00 p.m. and the defendant related one version of what occurred on the day in question. After a half-hour break at 5:30 p.m. there was further questioning. At about 7:00 p.m. Madruga-Jiminez gave a version of events which satisfied Officer Fernandez. A formal written statement was finally prepared between 8:30 and 9:30 p.m.
The trial court granted Madruga-Jiminez' motion to suppress all of the statements on the ground that he was not advised of his Miranda rights prior to the initial custodial interrogation which began at 10:30 a.m. The state has appealed that order. We affirm.

(A) THE INITIAL INTERROGATION
While the state concedes that Madruga-Jiminez was in custody during the initial questioning, it argues that the questioning was not interrogation under Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) and that the defendant's statements are therefore admissible. The trial court found otherwise and the record supports such a finding.
In Innis, the Supreme Court defined interrogation as any police practices "that the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301, 100 S.Ct. at 1689-90 (footnotes omitted). There can be no question that Officer Fernandez, armed with the information he already possessed, and not having informed the defendant that he was under arrest for murder, should have known that his background questions regarding the defendant's trip from Cuba and his past employment were reasonably likely to result in an incriminating response. At the very least, he was likely to obtain, as he did, confirmation of Madruga-Jiminez' associations with the victim and another suspect in the murder. Having found that the defendant was subjected to custodial interrogation without the benefit of Miranda warnings, the trial court was required to suppress the statements made between 10:30 a.m. and 12:10 p.m. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[3]

(B) THE SUBSEQUENT STATEMENTS
The trial court suppressed all of the defendant's statements. While the order does not state specific reasons for suppressing those statements made after Miranda warnings were given, we can only conclude that the trial court found those statements tainted by the earlier, unwarned statements. A decision in this case necessarily requires a discussion of the United States Supreme Court's recent decision in Oregon v. Elstad, ___ U.S. ___, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).
In Elstad, the Supreme Court held that a voluntary, unwarned statement does not necessarily render inadmissible a subsequent, warned statement. The focus of the *465 inquiry with regard to the second statement is whether, considering the totality of the circumstances, it was in fact voluntary. The court stated:
[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made... . We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.
Elstad, 105 S.Ct. at 1298.
Under Elstad, a court must first determine whether the initial statements, obtained in technical violation of Miranda, were in fact involuntary. If it finds those statements involuntary, then the subsequent statements must be suppressed unless the taint of the initial coercion is sufficiently attenuated. Factors to consider in determining whether the initial coercion has carried over to the subsequent statements include the time between the statements, whether the place of interrogation changed between statements and whether the identity of the interrogators changed with each statement. Elstad, 105 S.Ct. at 1294. See also Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975) (in determining whether the taint of unconstitutional activity is attenuated courts should be guided by: (1) the temporal proximity of the statements and the unconstitutional activity; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct).
If, on the other hand, the trial court finds that the initial statement, while obtained in technical violation of Miranda, was in fact voluntary, then it should suppress the subsequent statements only if, after viewing the totality of the circumstances, it finds that they were in fact involuntary. United States v. Wauneka, 770 F.2d 1434 (9th Cir.1985); see also Martin v. Wainwright, 770 F.2d 918 (11th Cir.1985). In interpreting Elstad, the Ninth Circuit Court of Appeals identified a number of factors which should be considered in determining whether the warned statements are in fact voluntary: "the time lapse between the initial confession and the subsequent statements; [the defendant's] contacts, if any, with friends or family members during that period of time; the degree of police influence exerted over [the defendant]; whether [the defendant] was advised that his prior admission [could or] could not be used against him; ..." United States v. Wauneka, 770 F.2d at 1440-41.
It is important to note, however, that Elstad involved only a technical violation of Miranda and the court was careful to so limit the decision by stating that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that the suspect has made an unwarned admission does not warrant a presumption of compulsion." (emphasis added) Elstad, 105 S.Ct. at 1296. We can only conclude from a reading of Elstad that when the police use deliberately coercive and improper tactics a presumption of compulsion is warranted. In that case, any subsequent statements must be suppressed unless the taint of the improper activity is sufficiently attenuated.
In this case Officer Fernandez first violated section 901.16 of the Florida Statutes (1981) by not informing Madruga-Jiminez that a warrant for his arrest had been issued on a charge of murder. Had Madruga-Jiminez been aware of those facts, he might have decided that silence was the best course. However, uninformed as he was, he answered questions, asked without Miranda warnings, which were likely to elicit incriminating responses. Officer Fernandez acknowledged that the purpose of the background interview was, in essence, to soften the defendant up. Application of the Elstad rationale is inappropriate when this type of police conduct has occurred. Utilization of a presumption of compulsion and a "taint analysis" more adequately serves the goals of obtaining trustworthy *466 statements and deterring police misconduct. See Elstad, 105 S.Ct. at 1293. Madruga-Jiminez' initial statements are therefore presumed to be compelled. Consequently, the subsequent statements can be admissible only if they were sufficiently attenuated to remove the taint of the initial misconduct.
The warned statements began immediately after the unwarned ones. Additionally, they were conducted in the same building, by the same officer from the same police agency, over an eight- or nine-hour period. It is also clear that Madruga-Jiminez spoke to no one besides the police during this period and was not informed that his initial statements could not be used against him.[4] The simple giving of Miranda warnings, by itself, was not sufficient to remove the taint of the improper tactics utilized to secure the initial statement. Accordingly, the order of the trial court is
Affirmed.
NOTES
[1] Officer Fernandez was required by section 901.16, Florida Statutes (1981) to inform Madruga-Jiminez of the cause of his arrest and that a warrant had been issued. He did not do so until approximately 12:15 p.m. after an initial 1 1/2-hour interrogation had occurred.
[2] During the course of the afternoon interrogations, Officer Fernandez told Madruga-Jiminez that there were witnesses at the scene of the murder. In fact, there was a single witness. Officer Fernandez testified that he used the plural "in an effort to bolster my interview of him to make seem [sic] the position a little stronger."
[3] Any attempt on the state's part to characterize the initial interrogation as a routine booking procedure is also rejected. See United States v. Hinckley, 672 F.2d 115, 122-23 (D.C. Cir.1982).
[4] We do not mean by this statement that the police are required to advise suspects that unwarned statements are inadmissible before they proceed with warned questioning. Such advice is a factor to consider, however, in deciding whether the taint of misconduct has been removed.