# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1994-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ABAYUBA RIVAS,

     Defendant-Appellant.

_____

Argued May 19, 2021 – Decided July 20, 2021

Before Judges Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 15-02-0114.

James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; James K. Smith, Jr., of counsel and on the briefs).

Regina M. Oberholzer, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Regina M. Oberholzer, of counsel and on the brief).

PER CURIAM

Tried by a jury, defendant Abayuba Rivas was acquitted of the murder of his wife Karla Villagra Garzon but was found guilty of the lesser-included offense of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and other related offenses. He appeals, arguing that the trial judge, having suppressed an earlier statement to law enforcement because it was obtained in violation of his Fifth Amendment right to counsel, erred in not suppressing his two subsequent statements in which he admitted killing his wife and aiding law enforcement to locate the suitcase he used to transport and discard her body. We disagree and affirm.

I

On February 24, 2014, defendant reported to the Elizabeth Police that his wife was missing when she did not return from a pharmacy that she went to at 10:00 p.m. the night before to get sinus medication. The police subsequently discovered that Villagra Garzon was not on any of the pharmacy's surveillance footage; no sinus medication was purchased from the pharmacy; and no one had seen her around the pharmacy that evening.

On February 27, defendant voluntarily reported to the Elizabeth police station where he gave a video-recorded statement to detectives detailing his

interactions with his wife the day she went missing. He stated that he did not try to locate her because he had to watch their two-year-old daughter. He gave the police permission to search his apartment, vehicles, computer, and cell phone. He also agreed to provide a buccal swab and to take a polygraph examination.

During a search of defendant's apartment, detectives collected a shirt with a stain on it that was found in a bedroom hamper. The stain tested positive for Villagra Garzon's blood, and a sample from the shirt's collar matched a partial profile of defendant's DNA. Also collected were several stain samples from defendant's car seats, which, except for one of the samples matching Villagra Garzon's DNA, were too small to draw any conclusions. A cadaver dog indicated the presence of human remains in the master bedroom, by a pair of brown work boots, and in the car's front passenger seat, driver's seat, and rear cargo area. The police department's license plate reader system revealed that defendant's vehicle had been driven in Elizabeth the night of February 23 and morning of February 24. Defendant's vehicle was also seen on surveillance camera videos collected from several businesses in Elizabeth.

Defendant was again interviewed by police on March 5 and March 13 After the later interview, defendant was arrested for endangering the welfare of

A-1994-18

a child, N.J.S.A. 2C:24-4(a), and hindering one's own apprehension by providing false information, N.J.S.A. 2C:29-3(b)(4); he admitted leaving his two-year-old daughter unattended at his apartment the night his wife went missing.

On March 17, defendant injured himself while in jail and was taken to the hospital. He was visited by Elizabeth Police Department Detectives Raymond Smith and Juan Guzman, was advised of his Miranda[1] rights and agreed to speak, but his statement was not recorded. He stated, contrary to his previous statements, that he had accompanied his wife to the pharmacy, and after leaving, they were carjacked by four men on the way to where defendant stored his trailers. Defendant claimed the men directed him to drive, while his wife sat in the backseat. The men told him that they knew where he and his wife lived and that they had a child, and if defendant told anyone about what had happened, "they would come back and kill him." The statement was cut short when medical personnel interrupted to take defendant for a CAT scan. The detectives decided not to wait, and defendant asked them to come back the next day.

---

[1] Miranda v. Arizona, 384 U.S. 436, 444-45 (1966).

A-1994-18

The detectives subsequently viewed surveillance camera recordings taken the night of the alleged carjacking from the parking lot where defendant kept his trailer. None of the events defendant described were confirmed on the recordings.

On March 18, Detectives Smith and Guzman returned to the hospital with Sergeant Larry Smith to continue interviewing defendant. Prior to defendant giving an audio-recorded statement, the detectives read him his Miranda rights. After a discussion about whether defendant needed an attorney, which will be detailed later, defendant admitted to killing his wife and disposing of her body in an abandoned house in Chatham. After the interview, the police found his wife's body at the abandoned house. The manner of death was determined to be homicide; the primary cause was asphyxia due to suffocation and smothering with a contributing cause of blunt force head trauma.

At the conclusion of the interview, the following colloquy occurred between Detective Smith and defendant regarding defendant's request to talk further:

> [Smith]: I think that we're going to leave, okay.
>
> [Defendant]: Who, you?

A-1994-18

[Smith]: Yeah me and Detective Guzman and my brother, umm we're gonna go up to the house and make sure that's the right house, umm and see if she's there, okay? They're kind of waiting for us. Umm cause we talked to you, you described it to us.

. . . .

[Smith]: Yeah, we're moving forward, right?

[Defendant]: <u>Yeah, I wanna talk with all of you three</u>.

[Smith]: Okay.

[Defendant]: Why he's not here.

[Smith]: I don't know if we're gonna do it later or maybe tomorrow.

[Defendant]: You coming tomorrow?

[Smith]: Oh, yeah tomorrow for sure.

[Defendant]: For sure.

. . . .

[Defendant]: But[,] ah[,] okay if you can come tomorrow.

[Smith]: Okay.

[Defendant]: For a little while.

[Smith]: Okay.

[Defendant]: <u>I want to talk with you</u>.

A-1994-18

[Smith]:  If we don't

[Defendant]:  Three of you together, someone else.

[Smith]:  [Defendant] if we don't find her, we're gonna come back and get, maybe we have the wrong house I don't know.

    . . . .

[Smith]:  Well[,] what we're gonna do tomorrow probably is go look for the suitcase, and the clothes, and then your phone.

[Defendant]:  With me?

[Smith]:  Yeah.  You think you can find that?

[Defendant]:  Wow that's too many days.

[Smith]:  Cause that's just a random place on the highway?  Okay.  Cause the house is different is kind of unique[,] and we can kind of find that easy but the other things.

[Defendant]:  Things on the street maybe they clean you know.

[Smith]:  Okay.  We'll take a look though.

[Defendant]:  Yeah, we take a look.

[Smith]:  We take a look, okay.

[Defendant]:  Yeah, umm.

    . . . .

A-1994-18

[Smith]: [I appreciate your] honesty[,] and I think you did the right thing.

[Defendant]: I was not honest at the beginning.

   . . . .

[Defendant]: And we're going forward.

[Smith]: We're going forward exactly.

[Defendant]: But don't forget that I need to talk with all of you.

[Smith]: Of course.

[Defendant]: I need time to talk with you.

[(Emphasis added).]

The next day, March 19, defendant was discharged from the hospital and was taken to the Union County Prosecutor's office for further questioning. Once again, he was read and waived his Miranda rights and provided a video-recorded statement detailing his activities on February 23.

Defendant revealed that in the evening, he got into a verbal and physical altercation with his wife in their kitchen. After she bit his finger that he pointed in her face, he punched her in the face, causing her to bleed. She then "slapp[ed]" him, and he pushed her into the sink, grabbed a meat tenderizer from the counter, and hit her on the side of her head. She continued slapping him, so he hit her a second time with the meat tenderizer. Thinking she was

A-1994-18

dead after she bled and fell to the ground motionless, defendant cleaned the kitchen floor and put tape over her eyes so that "she wouldn't see[,]" put tape over her mouth "so she [could] rest in peace[,]" taped her hands, and then placed her body in a suitcase.

Defendant left his sleeping daughter in the apartment and put the suitcase and a plastic bag with his wife's stained clothes and the meat tenderizer in his car. He then drove his car for some time until he came upon an abandoned and unlocked house, where he left the body in the basement. On his way home, defendant threw the plastic bag of things out the window and separately disposed of the suitcase.

Later that day, defendant led members of the prosecutor's office to the location of the suitcase, which they recovered. They were unable to recover the items in the plastic bag that defendant discarded. Afterwards, defendant was taken back to the prosecutor's office for another interview, which was conducted by Detective Danika Ramos. After being read and waiving his Miranda rights, defendant gave a brief statement explaining that he willingly took detectives to find the suitcase.

Defendant was indicted for first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d);

third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a); second-degree desecration of human remains, N.J.S.A. 2C:22-1(a)(1); third-degree hindering one's own apprehension by concealment or destruction of evidence, N.J.S.A. 2C:29-3(b)(1); and two counts of third-degree hindering one's own apprehension by giving false information, N.J.S.A. 2C:29-3(b)(4).

Prior to trial, defendant moved to suppress several statements he made to law enforcement. At the conclusion of a five-day evidentiary hearing, Judge Robert A. Kirsch issued an oral and fifty-six-page written opinion suppressing defendant's March 18 statement, but admitting his statements on February 25 and 27, March 5, March 13, March 17, and March 19.[2]

Defendant testified at trial, giving a third version of what happened the evening of February 23. He claimed that he was mugged by his wife's ex-boyfriend and another person, taken to his apartment where they raped and killed his wife, followed by their disposal of her body in the Chatham house. He also stated they threatened to kill him and told him that he "should go to the police" and "make a [police] report that [his] wife had left," which he did.

---

[2] The February 25 and 27, March 5, March 13, and March 17 statements are not relevant to this appeal so they will not be discussed in detail.

The jury rejected defendant's testimony, convicting him for the lesser-included offense of aggravated manslaughter, rather than murder, and all other charges.

## II

Defendant appeals the admission of his two March 19 statements. Because the suppression of the March 18 statement intertwines with the admission of the March 19 statements, we first briefly detail Judge Kirsch's reasoning for suppression. The judge determined that Detective Smith's "subjective interpretation" that defendant did not want counsel before he gave a statement "was arguably understandable," but

> that [defendant's] words at the outset of the interview were objectively unclear and ambiguous. [Defendant's] statement, "Ah a lawyer, I need time to find a lawyer. I need to see how much they charge me," reasonably could be construed as an invocation of his right to counsel, notwithstanding his beseeching the officers the night before to "please, please come back" to talk to him. [Defendant] could change his mind at any time, and arguably did so.
>
> In addition to the declaratory statement cited above, after the officers sought to clarify or explain the right to counsel, [defendant] again expressed a lack of clarity: "It's a little confuse [sic]."
>
> . . . .
>
> . . . The court finds [defendant's] statements regarding invocation of counsel equivocal, and law enforcement's attempt at clarification insufficient.

A-1994-18

Accordingly, the court will suppress the statements made by [defendant] during the interview conducted late in the afternoon and extending into the evening of March 18.

As for the initial statement on March 19, the judge found that it was not fruit of the poisonous tree warranting suppression as prescribed by State v. O'Neill, 193 N.J. 148, 171 n.13 (2007), because in accordance with State v. Hartley, 103 N.J. 252 (1986), defendant "without any doubt, actively sought and initiated 'further communications' with law enforcement after the initial tainted statement." The judge found "substantial 'intervening circumstances' between the initial confession on March 18 and the subsequent interview on March 19," including that: (1) the March 19 interview was conducted "about twenty . . . hours" after the conclusion of the March 18 interview; (2) defendant had been "medically discharged from the hospital, and psychiatrically evaluated and cleared"; (3) the March 19 interview was conducted in "a well-lit interview room at the [prosecutor's office] where [defendant] sat across a table from . . . Smith and Guzman, both with whom he had developed a mutually respectful rapport through their numerous prior interactions and conversations"; (4) "[t]he March 19 interview lasted approximately one . . . hour"; (5) defendant "was thoroughly advised of his constitutional rights," indicated that he understood his rights, and agreed to

12

waive them; (6) defendant was advised that the Consulate of Uruguay, his native country, had reached out, and that his family would pay for a lawyer, which he rejected; and (7) "there was no evidence" the detectives "engaged in improper or coercive tactics, made threats or otherwise created an environment of intimidation inducing duress or pressure."

In "consider[ing] the effect of [defendant's] confession on March 18 to his statement on March 19," the judge was "mindful of the 'cat out of the bag' scenarios where an accused, having already confessed, feels psychological pressure to make a second confession." Nevertheless, the judge found that "the two interviews [were] separate and distinct, both in time and location, and not a single continuing event." Moreover, the judge found that the March 18 confession "was not the byproduct of hour upon hour of exhausting, unrelenting interrogation where the accused was 'beaten down' and finally confessed." His review of the March 19 interview did "not reveal any comments by [defendant], or [anything in] his body language, which conveyed any 'second thoughts' or regrets about his prior confession"; "he appeared relaxed and made clear his desire to cooperate in any way he could." Thus, Judge Kirsch deemed the first March 19 statement admissible.

A-1994-18

As for the second March 19 statement, the judge found that this statement was also admissible, primarily for the same reasons as the first March 19 statement.

## III

Defendant argues the judge erred in finding that he had initiated further communications with the detectives because "the record is clear that it was the police who initiated the March 19[,] interrogation by bringing defendant from the hospital to the [p]rosecutor's [o]ffice in a hospital gown and placing him in an interview room." Additionally, defendant maintains "there clearly was not a request for a 'discussion of the crimes for which [he] was being held'"; instead, "he only said that. . . he wished to speak to the officers, but did not say why." We are unpersuaded.

When reviewing a judge's ruling on a motion to suppress, we defer to those factual findings that are supported by sufficient record evidence but disregard findings that are clearly mistaken. State v. Hubbard, 222 N.J. 249, 262 (2015). We, however, review the judge's legal conclusions de novo. Id. at 263.

A suspect who invokes his or her right to counsel during a custodial interrogation is "not subject to further interrogation by the authorities until

14

counsel has been made available to him, unless the accused [him or her] self initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); see also State v. Alston, 204 N.J. 614, 620 (2011) (noting that after a suspect has requested counsel, "an interrogation may not continue until 'the suspect is provided with counsel' or the suspect initiates further communication sufficient to waive the right to counsel").

A suspect is considered to have initiated further communication if he or she invites "discussion of the crimes for which he [or she] was being held." State v. Chew, 150 N.J. 30, 64 (1997) (quoting State v. Fuller, 118 N.J. 75, 82 (1990)). The State must establish that it was the accused, rather than the police, who initiated any further questioning after the accused has invoked his right to counsel. State v. Wright, 97 N.J. 113, 122-23 (1984). Yet, "[i]f an accused does initiate a conversation after invoking his rights, that conversation may be admissible if the initiation constitutes a knowing, intelligent, and voluntary waiver of the accused's rights." Chew, 150 N.J. at 61 (citing Miranda, 384 U.S. at 444).

The record supports Judge Kirsch's determination that at the end of the March 18 statement that was suppressed due to defendant's invocation of his

right to counsel, defendant unequivocally stated he wanted to talk again. In fact, after the interrogation ended because defendant had to have a CAT scan performed, he stated four times that he wanted to talk again to the detectives. When the detectives returned to the hospital the next day, some twenty hours later, defendant was released; so, they took him to the prosecutor's office to follow up on the aborted interview, as he requested. Defendant was read his Miranda rights, knowingly waived them without asking for counsel and provided a video-recorded statement detailing how he killed his wife by hitting her with a meat tenderizer and taping her mouth, then how he disposed of her body.

Defendant's reliance on State v. Wint, 236 N.J. 174 (2018), is misplaced. (Db33-Db34). In Wint, after the defendant was advised of his Miranda rights, he repeatedly and unequivocally requested counsel. Id. at 183-84, 201. After questioning ceased and the defendant left the interview room, "the detectives initiated an unrecorded verbal exchange with him[]," when they "wished him good luck and stated, '[w]hen we get you back to Bucks County we can talk about this again.'" Id. at 184. The defendant responded, "[y]eah, I'll talk to you when we get back to Bucks County." Ibid. Several months later, the detectives once again met with the defendant, who was being held in the

A-1994-18

Camden County jail, to collect DNA samples from him. Ibid. At that time, "the detectives informed him that they were taking steps to transfer him to Bucks County where they would like to talk to him." Ibid. The defendant reportedly responded, "I'll talk to you when I get back to Bucks [County]." Ibid. (alteration in original). Six months after his initial invocation, he was transported to Bucks County. Ibid. Once there, he was taken to an interview room where he was advised of his Miranda rights, which he agreed to waive. Ibid. The defendant then provided a lengthy statement regarding his involvement in the crime. Id. at 185. Our Supreme Court suppressed that statement because, among other things, the "detectives initiated" the conversations with the defendant. Id. at 205. In other words, the defendant "did not 'initiate[] further communication, exchanges, or conversations with police,' to open the door to an interrogation without counsel." Id. at 202 (alteration in original) (quoting Edwards, 451 U.S. at 485; citing Alston, 204 N.J. at 620).

This case differs from Wint, as here it was defendant who initiated further conversation with detectives. As noted, defendant implored the detectives four times to return to talk to him again the next day. Hence, Wint does not support defendant's position.

We also reject defendant's contention that the judge erred in emphasizing factors such as the elapsed time between the two statements. He contends it was error for the judge to "equate[] the Fifth Amendment right to counsel with the right against self-incrimination," because as Edwards, 451 U.S. at 483, held "additional safeguards are necessary when the accused asks for counsel." However, defendant effectively asserts those additional safeguards are of no moment when he initiates further conversation with law enforcement because, in those instances, no Edwards violation has occurred. See Wint, 236 N.J. at 206 (holding that an Edwards violation could not be subject to an attenuation analysis).

As the judge correctly recognized, an attenuation analysis is appropriate to determine whether a second incriminating statement was the product of the illegally obtained first statement, or in other words, was the "fruit of the poisonous tree." Hartley, 103 N.J. at 282. Factors to consider include "the time between confessions, any intervening circumstances, whether there was a change in place, whether defendant received an adequate warning of his [or her] rights, whether the defendant initiated the second confession, the effect of his [or her] having previously made a confession, and the 'purpose and flagrancy of police misconduct.'" Id. at 283 (quoting Brown v. Illinois, 422

18

U.S. 590, 603-04 (1975); citing <u>Robinson v. Percy</u>, 738 F.2d 214, 221 (7th Cir. 1984); <u>United States v. Wauneka</u>, 770 F.2d 1434, 1440-41 (9th Cir. 1985)). Contrary to defendant's argument, it was not error for the judge to examine factors such as the elapsed time between the two statements, the re-administration of <u>Miranda</u> warnings, and the general tone of the March 19 interview, because defendant initiated further conversation with the detectives. Therefore, the first March 19 statement was admissible under <u>Edwards</u>.

As for defendant's second March 19 statement disclosing the location of the suitcase and his involvement in helping detectives locate it, the judge properly admitted the statement for the same reasons he admitted the first March 19 statement. Namely, that when defendant initiated further conversation with detectives, nearly twenty hours had passed since the March 18 interview; <u>Miranda</u> warnings were re-administered; and the general tone of the interview was nonconfrontational. Moreover, the second interview was taken by Ramos, who had not been involved in either of the interviews that took place at the hospital on March 18 or the first March 19 interview.

Accordingly, defendant is not entitled to a new trial, and thus, his convictions remain undisturbed.

19

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1994-18