**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellant,*

          v.

ALEXANDER BASSIGNANI,
              *Defendant-Appellee.*

No. 07-10453

D.C. No.
CR-06-00657-SI

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Yvonne Illston, District Judge, Presiding

Argued and Submitted
September 11, 2008—San Francisco, California

Filed March 25, 2009
Amended August 6, 2009

Before: Diarmuid F. O'Scannlain, Ronald M. Gould, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain;
Dissent by Judge Bea

**COUNSEL**

Amber S. Rosen, Assistant United States Attorney, argued the cause for the plaintiff-appellant and filed the briefs; Joseph P. Russoniello, United States Attorney, and Barbara J. Valliere, Chief, Appellate Section, were on the briefs.

Stephen Shaiken, San Francisco, argued the cause for the defendant-appellee and filed a brief.

**ORDER**

The opinion filed in this case on March 25, 2009, is amended as follows:

At page 3824 of the slip opinion, line 17, delete <who accompanied Williams>.

At page 3827 of the slip opinion, lines 9-11, replace <two disputed threshold issues: the appropriate standard of review and the burden of proof. A> with <a disputed threshold issue: the appropriate standard of review.>

At pages 3827-28 of the slip opinion, delete the two paragraphs that form Section II.B, beginning with <Though the district court did not explicitly address the burden of proof>

At page 3828 of the slip opinion, lines 14-15, replace <Keeping the appropriate standard of review and the burden of proof in mind, we turn to the question whether Bassignani established that he was "in custody"> with <Keeping the appropriate standard of review in mind, we turn to the question whether Bassignani was "in custody">

At page 3835 of the slip opinion, lines 10-15, replace <that Bassignani has met his burden of showing> with <that the facts as determined by the district court show>

## II

The panel has voted to deny the petition for rehearing en banc. Judges O'Scannlain and Gould voted to deny the petition for rehearing en banc. Judge Bea voted to grant the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing en banc is DENIED. No further petitions for rehearing or rehearing en banc may be filed.

---

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a criminal defendant was "in custody" when police officers interviewed him for over two hours in a conference room at his workplace.

## I

### A

In 2005, Yahoo, Inc. reported that "a user with the email address 'big_perm2469@yahoo.com' had uploaded child por-

nographic images to Yahoo sites." That report caught the attention of the Sacramento Valley High Tech Crimes Unit, which launched an investigation. During the ensuing inquiry, officers discovered that an alternate e-mail address for the same user was "alex.bassignani@tellabs.com." Tellabs is a business located in two locations—on North McDowell Boulevard and on South McDowell Boulevard—in Petaluma, California.

Based upon such circumstantial evidence, the investigators began building a case. Detective James Williams contacted Tellabs and confirmed that a man named Alex Bassignani worked there. Tellabs personnel also told Williams that "Bassignani had access to a desktop computer with internet access; and that . . . Bassignani had installed on a work computer . . . software called 'Window Washer,' which can be set to delete and overwrite Internet-browsing history and other information on a computer hard drive."

Using the information provided by Tellabs, investigators obtained a warrant to search Bassignani's workspace. The warrant also permitted officers to search Bassignani's residence, vehicle, and person. Officers were authorized to seize computer software and any images of child pornography.[1] Although Bassignani worked at the *South* McDowell Boulevard site, the warrant only authorized officers to search the *North* McDowell Boulevard location.

---

[1]More specifically, the warrant authorized officers to search (1) "[t]he workspace belonging to/under the control of Alexander Bassignani, located within a Business known as Tellabs located at, 1465 North McDowell Blvd., Petaluma, California," (emphasis omitted) (2) Bassignani's residence, (3) the vehicle found to be registered to Bassignani and his wife, "including containers of any kind within the vehicle," (4) "[a]ny vehicle in the immediate vicinity of 1465 North McDowell Blvd, Petaluma, California, that is in the custody or control of Alexander Bassignani," (emphasis omitted) and (6) Bassignani's person.

On February 23, 2006, Detective Williams and three other officers served the search warrant at the North McDowell Tellabs location. They were informed of the mistake and went immediately to the South McDowell site. After they arrived, Sasha King, Tellabs' Human Resources Manager, guided them to Bassignani's work station, where she reported the following encounter: "Detective [Williams] approached Bassignani and asked him to remove himself from the computer. Bassignani was hesitant, so Detective Williams reiterated the request a few times more before Bassignani complied. Bassignani was then instructed to follow me as Detective Williams remained at Bassignani's side."[2] The officers were in plain clothes and no weapons were visible. One officer stayed behind to remove the hard drive on Bassignani's computer.

King then led Bassignani and Williams to a Tellabs conference room where two officers were already waiting. King entered the conference room first, and stepped to the side to allow Bassignani to enter. Bassignani chose a chair on the left side of the table, and Williams sat down across from him. The two officers departed to search Bassignani's car, and closed the conference room door behind them.[3] The parties dispute whether the officers frisked Bassignani before allowing him into the conference room.

Before the interview began, Williams told Bassignani that he was "not under arrest. You're not being arrested. You'll walk out of here when we're done." He did not, however, ever tell Bassignani explicitly that he was free to leave. In addition, in an attempt to " 'make things easier for everybody' with regard to executing the search warrant at defendant's house,"

---

[2]The parties dispute whether Williams "instructed" Bassignani to go to the conference room. Williams claims that he told Bassignani "that it would be best if we could go to a conference room so that we [could have] some privacy."

[3]The parties dispute whether the conference room door was locked. The district court did not make a factual finding on that point.

Williams asked Bassignani "whether [his] wife was home, whether [he] had any dogs or guns, and where [his] house keys were." Williams also requested Bassignani's car keys, saying that without them officers would have to break into Bassignani's vehicle to execute the search warrant.[4] Bassignani resisted for a few minutes, but then told Williams that the keys were in his lunch pail.

Williams then questioned Bassignani about his alleged involvement in possessing and uploading images of child pornography. Williams' tone was calm and measured throughout. For the most part, Bassignani participated actively, saying that "I understand what you're doing. I understand what you're saying. I'm more than happy to go with you through the process." Bassignani admitted to possessing and uploading child pornography. Meanwhile, officers discovered the components of the "Window Washers" program in Bassignani's lunch pail and vehicle parked in the South McDowell Tellabs parking lot. Other officers also uncovered evidence of images of child pornography on Bassignani's home computer.

Not all of the interrogation, however, was completely civil. Bassignani said to Williams at one point: "I don't want you to get mad again, because you make that face . . . I understand that you're doing your job, but I just needed at the beginning to slow you down for just a second, you know, I don't want you to get mad, to start threatening and this and that, I want to steer clear of that." In addition, near the end of the interview, Williams told Bassignani that "the big thing is, it's your laptop . . . I'm not going to lie to you . . . we've got your email connected to the images, it's a done thing."

---

[4]Detective Williams incorrectly represented to Bassignani that the warrant permitted officers to search Bassignani's car parked outside the Tellabs site at South McDowell Boulevard. In fact, the warrant only authorized officers to search vehicles in the immediate vicinity of the *North* McDowell Boulevard Tellabs site.

Also near the end of the interrogation, Bassignani asked: "[A]t what point in this game do I need to get a lawyer?" Williams replied: "Me? I'd wait until you get arrested, but that's me. Like I said at the beginning, you're not under arrest, you're going to walk out of here." Williams also told Bassignani that he was "more than welcome to walk right out and call [a lawyer]." After Williams announced that the interview was finished, Bassignani prolonged it by asking questions for approximately ten additional minutes. After about two and a half hours, Bassignani walked out of the conference room without being arrested. The government concedes that Bassignani was not given the *Miranda* warnings.

B

A grand jury indicted Bassignani on one count of distributing images of child pornography and one count of possessing images of child pornography. Bassignani faces five to twenty years in prison for the first count and up to ten years on the second count. *See* 18 U.S.C. § 2252(b)(1)-(2).

In a pretrial motion filed in the United States District Court for the Northern District of California, Bassignani moved to suppress his statements during the interrogation, the Window Washers program found in his lunch pail and car, and the evidence found on the Tellabs computers. He challenged the admissibility of his statements on the ground that he was "in custody" for *Miranda* purposes and had not been given the four required warnings. He also argued that the evidence found in his car and on the Tellabs computer should be suppressed based on the mistaken address contained in the warrant.

The district court reviewed "the totality of the circumstances surrounding the interrogation" and concluded that "the defendant was in custody for *Miranda* purposes." Accordingly, it granted Bassignani's motion to suppress the statements and the evidence found in the lunch pail. The dis-

trict court denied the motion to suppress the evidence obtained from Bassignani's Tellabs computer and in his car.

The United States timely appealed, challenging the district court's determination that Bassignani was "in custody" for *Miranda* purposes. The government also contended that the district court erred by not explicitly putting the burden of proof on Bassignani to show that he was in custody. The government did not challenge the district court's suppression of the evidence found in Bassignani's lunch pail.

## II

Before determining whether Bassignani was in custody for *Miranda* purposes, we must resolve a disputed threshold issue: the appropriate standard of review.

Bassignani claims that the government is challenging the district court's "factual determinations," findings which should be reviewed for "clear error." In response, the United States contends that "[w]hile it is true that factual findings are reviewed for clear error, whether a person is in custody is reviewed *de novo*."

We agree with the government's interpretation of the standard of review. Although it has been a subject of some confusion in the past, it is now clear that a district court's "in custody" determination is a "mixed question of law and fact warranting *de novo* review." *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). However, "[t]he factual findings underlying the district court's decision . . . are reviewed for clear error." *Id.* These factual findings include "scene- and action-setting questions," as well as "the circumstances surrounding the interrogation." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

## III

Keeping the appropriate standard of review in mind, we turn to the question whether Bassignani was "in custody" when Detective Williams interrogated him.

**[1]** Before interrogating a suspect, police officers generally must give the four warnings that *Miranda* requires. But "[a]n officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is 'in custody.' " *Kim*, 292 F.3d at 973 (internal citation omitted).

"To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (internal quotation marks and citation omitted) (alteration in original). The court must "examine the totality of the circumstances surrounding the interrogation." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008). A defendant is in custody if a "reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981). The custody determination is objective and is not based upon "the subjective views of the officers or the individual being questioned." *Kim*, 292 F.3d at 973.

**[2]** We have identified five factors relevant to the custody determination: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Id.* at 974. (internal quotation marks and citation omitted). These considerations are not exhaustive; "[o]ther factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators." *Id.* Guided by these factors, we turn to the circumstances surrounding Bassignani's interrogation.

**[3]** We begin with the first *Kim* factor: "the language used to summon the [defendant]." Where we have found an interrogation non-custodial, we have emphasized that the defendant "agreed to accompany" officers to the police station or to an interrogation room. *See United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc); *see also United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005). Here, the district court found that the detectives, after approaching Bassignani from behind and asking him to "remove himself from the computer," "instructed" Bassignani to go to the conference room.[5] An "instruction" is short of an "order," but it is plain that Bassignani did not voluntarily "agree to accompany" the officers to the conference room. We agree with the district court that the first *Kim* factor weighs in favor of finding that Bassignani was in custody.

We turn to the second *Kim* factor: "the extent to which the defendant was confronted with evidence of guilt." We have found a defendant in custody when the interrogator adopts an aggressive, coercive, and deceptive tone.[6] In *United States v. Beraun-Panez*, 812 F.2d 578, 579 (9th Cir. 1987), for example, "[t]he officers demanded to know why [Beraun-Panez] was lying and said they knew the truth. They told him that witnesses had placed him at the scene, even though their two

---

[5]To be sure, the parties dispute whether Williams "instructed" Bassignani to accompany him to the conference room. The government contends that "the court simply chose Ms. King's version" without "holding a hearing to question any of the witnesses or evaluate their credibility." But we review underlying factual findings for "clear error." *See Kim*, 292 F.3d at 973. The district court's finding on this point is amply supported by Ms. King's affidavit.

[6]We have recently, however, found a custodial interrogation even though "the officers did not make any threats or promises to induce [the defendant] to speak." *Craighead*, 539 F.3d at 1079. *Craighead*, however, is distinguishable. It involved eight armed police officers from three different agencies who entered and searched Craighead's home. "[S]ome . . . unholstered their firearms in Craighead's presence." *Id* at 1078. The officers also "directed" the defendant to an unfurnished storage room at the back of his house, where one officer blocked the exit. *Id.*

witnesses had in fact stated only that they had seen a tan truck, like that Beraun-Panez used, within several miles of [the site of the alleged crime]." *See also United States v. Wauneka*, 770 F.2d 1434, 1439 (9th Cir. 1985) ("The questioning progressed for over an hour and turned accusatory— Wauneka was told that he supplied information that only a perpetrator would know, that he matched the description of the rapist, and that he had better tell the truth."). In contrast, we have found a defendant not in custody when the officers "did not attempt to challenge [the defendant's] statements with other 'known facts' suggesting his guilt, they merely asked [him] about the allegations." *Norris*, 428 F.3d at 913 (citation omitted).

[4] Here, nearly the entire two and a half hour interview was conducted in an open, friendly tone. Bassignani participated actively. The conversation was plainly consensual. Indeed, a review of the entire recording of the interrogation creates the unmistakable impression that Bassignani was behaving strategically; he was probing to find out how much the officers knew. He said: "I'm trying to save my own ass here. I mean let's be honest. I'm trying to get as minimal impact of this as possible." We defer to the district court's view that "Williams repeatedly interrogated [Bassignani] about his use of the big_perm2469@yahoo.com account and specific images of child pornography associated with that account." The recording of the interrogation, however, shows that with a single exception, the questioning was not confrontational as it was in *Beraun-Panez* and in *Wauneka*.[7] As in

---

[7]The district court and the dissent rely heavily on a confrontational statement Williams made near the end of the interrogation: "[T]he big thing is, it's your laptop . . . I'm not going to lie to you . . . we've got your email connected to the images, it's a done thing." We accept the district court's factual finding that this statement occurred and that it was confrontational in nature. It is a separate question, however, whether that statement was legally sufficient to convert the interview into a custodial interrogation. On that point, we disagree with the district court and with

*Norris*, Williams "merely asked" about the allegations. Accordingly, while we defer to the district court's factual finding that Bassignani was "extensive[ly] questioned about evidence of [his] guilt," we disagree with its legal conclusion that such questioning "weighs in favor of finding that [Bassignani] was in custody." Rather, we conclude that the second *Kim* factor weighs against a finding that the interrogation was custodial.

Next, we address the third *Kim* factor: the physical surroundings of the interrogation. We have held that an interrogation conducted in familiar surroundings weighs against a finding that the defendant was in custody. *United States v. Eide*, 875 F.2d 1429, 1437 (9th Cir. 1989). However, we have also noted that "isolating the defendant from the outside world . . . largely neutralizes the familiarity of the location as a factor affirmatively undermining a finding of coercion." *Kim*, 292 F.3d at 977.

*Kim* is instructive. In that case, Kim, who spoke only limited English, and her husband arrived at their own store to find it crawling with police officers. *Id.* at 971. They approached the door, which was locked. *Id.* Officers allowed Kim inside, but locked her husband out. Her husband waited outside for three hours. *Id.* We noted that "the police . . . temporarily took over *complete control* of Kim's store, creating a 'police-dominated atmosphere,' in which the police kept Kim physically isolated from two family members who could have provided both moral support and, given her limited English, a more complete understanding of the overall situation." *Id.* at 977 (emphasis added). We reasoned that "the fact

---

the dissent. One brief confrontational moment in an otherwise cordial interview is not determinative in a "totality of the circumstances" analysis. More importantly, even if Williams' isolated comment transformed the interview into a custodial interrogation, Bassignani made his incriminating statements in the two hours prior to the statement.

that she was familiar with the location of the interview, considered in isolation, might weigh in favor of concluding that she was not 'in custody' during the questioning." *Id.* But we nevertheless concluded that "under all the circumstances here . . . a reasonable person would not have felt free to leave." *Id.*

[5] Here, Bassignani was interviewed at a conference room within his workplace—plainly a familiar environment. There is no finding that the officers prevented anyone from coming or going during the interview. Indeed, several officers and King went in and out of the room. Nothing in the record or in the recording of the interrogation indicates that Bassignani was "isolat[ed] . . . from the outside world," *id.*, or prevented from contacting others. Unlike Kim, it seems that Bassignani had a "complete understanding of the overall situation." *Id.* We therefore conclude that *Kim* is distinguishable.

The district court thought that "a workplace is certainly a more comfortable and familiar environment than a police station," but that "the surroundings were nevertheless somewhat coercive as defendant was brought to an enclosed conference room by a Human Resources manager and two to three police officers for lengthy questioning." The district court's conclusion on this point improperly collapses three separate parts of the *Kim* analysis into one. The first *Kim* factor relates to the manner in which the defendant went to the interrogation room and the fourth *Kim* factor deals with the length of the interrogation. In addition, the recording of the interrogation plainly reveals that the Human Resources manager was present only for a time and that the other officers went in and out of the conference room during the interview. Accordingly, although we accept the district court's factual finding that Bassignani "was brought to an enclosed conference room" at his workplace, we are persuaded that the physical surroundings of the interrogation suggest that Bassignani was not in custody.

[6] Turning to the fourth *Kim* factor: the duration of the detention, our precedents suggest that a two-and-a-half hour

interrogation is at the high end. We have found a defendant not in custody when he was interrogated for "more than one hour," *Crawford*, 372 F.3d at 1052, and "approximately 45 minutes." *Norris*, 428 F.3d at 911. In contrast, we have found a defendant in custody when she was interrogated for 45 to 90 minutes. *Kim*, 292 F.3d at 972. We therefore agree with the district court that the lengthy interrogation weighs in favor of finding that Bassignani was in custody. We note, however, that this was not a "marathon session designed to force a confession," *Davis v. Allbrooks*, 778 F.2d 168, 171 (4th Cir. 1985), and we therefore accord less weight to this factor.

**[7]** Finally, we address the fifth *Kim* factor: the degree of pressure used to detain the defendant. We have consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time. *See Crawford*, 372 F.3d at 1060 ("Perhaps most significant for resolving the question of custody, Defendant was expressly told that he was not under arrest . . ." ); *Norris*, 428 F.3d at 912 ("[Norris] was told that his cooperation was voluntary and that he was free to terminate the interview at any time. Norris was also told that he was not under arrest and he was never restrained in any way."). Other courts agree. *See, e.g.*, *United States v. Leese*, 176 F.3d 740, 744 (3d Cir. 1999) ("Not only was Leese told that she was not under arrest before the questioning began, but she was specifically informed that when the questioning was concluded the inspectors would be returning to Harrisburg and she would not be going with them.").

**[8]** Here, as in *Crawford*, *Norris*, and *Leese*, Williams did not pressure Bassignani to confess or to stay in the conference room. Although Williams never explicitly said that Bassignani was free to leave, Williams did emphasize in the first two minutes of the interview that Bassignani was not under arrest and would not be arrested. Near the end of the interrogation Williams confirmed that point, saying: "Like I said at the

beginning, you're not under arrest."**8** In addition, Bassignani was never physically restrained.

[9] While we recognize that this is a close case, it is significant that Bassignani was not "confronted with evidence of his guilt," that the interview took place in familiar surroundings, and that the officers did not pressure Bassignani to confess. The second, third, and fifth *Kim* factors therefore strongly suggest that the interrogation was not custodial. To be sure, Bassignani did not voluntarily accompany the officers to the conference room, and the interrogation was lengthy. We are persuaded, however, that the overall tenor of the interrogation was not coercive. Therefore, we do not think, based on a review of the totality of the circumstances, that the facts as determined by the district court show a "restraint on freedom of movement of the degree associated with a formal arrest." *Kim*, 292 F.3d at 973 (internal quotation marks and citations omitted). A "reasonable innocent person in [Bassignani's circumstances] would conclude that after brief questioning he or she would . . . be free to leave." *Booth*, 669 F.2d at 1235. Accordingly, we are satisfied that the interrogation was not custodial.

IV

The dissent suggests that we have discarded the district court's factual determinations, essentially assuming the role of appellate factfinder. *See* Dissent at 10441-45. We do no

---

**8**Williams told Bassignani: "You'll walk out of here when we're done," a statement the district court thought "implied" that Bassignani was not free to leave. Based upon our own review of the recording of the interrogation, we believe that that statement proves the opposite point. Williams was reassuring Bassignani that he was not under arrest; he was not implying that Bassignani was confined to the conference room. However, even if we treat the district court's conclusion on this point as a factual finding entitled to deference, we note that Williams suggested that Bassignani was free to leave when he said that Bassignani was "more than welcome to walk right out and call [a lawyer]."

such thing. We do not "say the district court committed clear error" in any of its factual determinations, as the dissent implies. Dissent at 10443. Rather, we accept the district court's findings of fact, but we disagree with the district court and with the dissent that those facts establish, as a matter of law, that Bassignani was "in custody" during the interview. In contrast to the underlying factual determinations, we must decide the legal issue — whether Bassignani was in custody — de novo. That is the bifurcated analytical framework required by the Supreme Court and by our precedent. *See Keohane*, 516 U.S. at 112-13; *Kim*, 292 F.3d at 973.

By contrast, in the dissent's view, "we must determine whether the district court committed clear error when it determined Bassignani was 'in custody.' " Dissent at 10441. This approach effectively bars de novo review of the district court's legal conclusion that Bassignani was in custody. It also confuses the distinction our precedent has drawn, in the Fourth Amendment area, between issues of fact and questions of law. Some areas of Fourth Amendment jurisprudence, of course, call for clear error review both of the district court's underlying factual determinations *and* of its final conclusion. *See, e.g.*, *United States v. Enslin*, 327 F.3d 788, 792 (9th Cir. 2003) ("Whether consent to search is voluntary depends upon the totality of the circumstances and is a question of fact that we review for clear error."). But the question whether a defendant was in custody during an interrogation is not one of them.

V

**[10]** The district court's order suppressing Bassignani's statements made during the interrogation is REVERSED and this case is REMANDED for further proceedings.

BEA, Circuit Judge, dissenting:

Were the standard of review for factual determinations in this case *de novo*, I might join my colleagues. However, while the standard of review for a district court's "in custody" determination is a mixed question of law and fact warranting *de novo* review, we review the factual findings underlying the district court's decision for *clear error*. *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). After setting forth the five prong test for determining if a person was "in custody" when he made incriminating statements, the *Kim* court itself reviewed the district court's findings in that case on each of the five prongs for clear error, not *de novo*:

> The district court's factual findings are not clearly erroneous, as they are supported by testimony in the record that the judge determined was credible. After reviewing the factual findings under all of the circumstances . . . we conclude that Kim was "in custody" for *Miranda* purposes because a reasonable person in Kim's circumstances would not have felt free to leave.

*Kim*, 292 F.3d at 974.

A police officer is required to read a person his *Miranda* rights before conducting an interrogation if the person is "in custody." "To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Kim*, 292 F.3d at 973 (internal quotation marks and citation omitted) (alteration in original). Here, the State concedes it did not read Bassignani the *Miranda* warnings before he confessed. Thus, we must determine whether the district court committed clear error when it determined Bassignani was "in custody."

"A finding of fact is clearly erroneous when the evidence in the record supports the finding but 'the reviewing court is left with a definite and firm conviction that a mistake has been committed.' " *Burlington N., Inc. v. Weyerhaeuser*, 719 F.2d 304, 307 (9th Cir. 1983).

Here, both the majority and the district court employ the analysis in *Kim*. The district court analyzed and weighed each of the five factors to determine whether Bassignani was in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966). *United States v. Bassignani*, 2007 WL 2406868, *4-6 (N.D. Cal.). The district court also correctly acknowledged the *Kim* factors are not exhaustive and that the "in custody" determination rests upon an objective inquiry of the totality of the circumstances. *Id.* at *4.

After reviewing the parties' declarations and listening to the entire interrogation of Bassignani (as did I), the district court determined that Bassignani was in custody for *Miranda* purposes. *Bassignani*, at *5-6. The district court based its conclusion on the following factual findings applied to the *Kim* factors:

First, the district court found Bassignani did not voluntarily approach or accompany the officers. On this we all agree. Ms. King, the Tellabs Human Resource manager, stated in her declaration that Detective Williams and another officer approached Bassignani's workspace and instructed Bassignani to follow Ms. King and the police officers to an enclosed conference room. Thus, this factor weighs in favor of Bassignani's claim he was in custody.

Second, the district court found Bassignani was confronted with evidence of his guilt. The majority disagrees. The evidence supports the district court's finding that this confrontation took place: The taped interrogation showed that during questioning, Detective Williams repeatedly confronted Bassignani with evidence of his guilt, including, *inter alia*, stat-

ing, "it's your laptop[1] . . . I'm not going to lie to you . . . we've got your email connected to the [child pornography] images, it's a done thing." The police so told Bassignani after their search of his residence had uncovered a laptop computer with child pornography on the hard drive. Bassignani therefore knew the police had found incriminating evidence at his house. The majority finds this evidence insufficient to turn an "otherwise cordial interview" into a confrontation. Maj. Op. at 10436 n. 7. Here, the district court's finding that Bassignani was confronted by the police with evidence of his guilt is plausible. Regardless the "tone" of voice used to confront Bassignani with this evidence—which the district court also heard—the content of the conversation makes this case much closer to *United States v. Beraun-Panez*, 812 F.3d 578, 579 (9th Cir. 1987); it provided sufficient evidence for the district court's finding.

Further, I disagree with the majority's assessment that because Bassignani was trying to assess what the police knew, it somehow turned this into a friendly chat. The majority relies on the following remarks by Bassignani: "I'm trying to save my own ass here. I mean, let's be honest. I'm trying to get minimal impact of this as possible." The majority may conclude this made it a cordial conversation, but the district court surely was not clearly erroneous in finding these statements indicated Bassignani knew he was in trouble, he was trying to limit the damage he was about to suffer, and there was nothing friendly about the conversation. Rather, it was plausible for the district court to find the conversation was a police interrogation and the police were looking for evidence to convict him, not someone else.

Because there is evidence in the record to support the district court's finding, we cannot say the district court committed clear error. This finding required the district court to examine exactly what the police said to Bassignani and how

---

[1]Bassignani has denied he owned or possessed a laptop computer.

a reasonable person would have interpreted such statements, which is a factual determination. When reviewing for clear error, "this court will not reverse if the district court's findings are plausible in light of the record viewed in its entirety . . . even if it is convinced it would have found differently." *Katie A., ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150, 1155 (9th Cir. 2007) (citation omitted).

Third, the district court found that the setting was a neutral factor in the analysis. The majority disagreed and found that because Bassignani was familiar with the conference room and because his employment superior, King, left the room, the surroundings were familiar and this factor should weigh against Bassignani's claim he was in custody. The evidence, however, showed that the location of the interrogation limited Bassignani's freedom. Bassignani was instructed to go to the conference room by the officers and his employer. *See* first factor, *supra*. It was at his place of work, a place where his freedom of movement was subject to his superior's orders and the orders of the police. I agree there is no evidence in the record that the officers locked the door, as they did in *Kim*, but it was not made clear to Bassignani he could leave "at any time" or that he was free to have anyone else accompany him. Accordingly, the record does not allow us to hold the district court's finding that the setting weighed neither for nor against a finding Bassignani was in custody was clearly erroneous.

Fourth, the district court found the tape recording of the interrogation showed the questioning lasted approximately two and a half hours, which is at the "high end" of this court's precedent for what constitutes an "in custody" determination, *see Kim*, 292 F.3d at 977 (finding fifty minutes of questioning was not a "brief inquiry" but a "full-fledged interrogation"). On this point, we are all agreed. Thus, the district court was not clearly erroneous in finding this factor weighed toward Bassignani's claim he was in custody.

Finally, the district court found that under all the circumstances a reasonable would not have believed he could freely

walk away from the interrogation at any time, but would instead have thought he had to stay until the police were finished questioning him. *Kim*, 292 F.3d at 974. The majority disagreed. Here again, the record contains evidence that supports the district court's finding. Detective Williams's statement to Bassignani at the beginning of the interview when he said, "[y]ou'll walk out of here *when we're done*," implied Bassignani was not free to leave at any time, but had to stay until the officers had finished their work. *Bassignani*, at *4-6 (emphasis added). The majority looks to Detective Williams's statement that Bassignani was not under arrest as a basis upon which to disagree with the district court's finding.

This was a factual finding by the district court based on the evidence in this particular record. I fail to see how we can overturn the district court's finding a reasonable person would not have thought he was free to leave at any time when he was instructed to accompany three police officers to the conference room, told he would be free to leave "when we're done," and then confronted more than once with evidence of his guilt. Again, even though we might have found differently were we sitting as a trial court, the district court's factual findings here are plausible in light of the record viewed in its entirety. Thus, we cannot say the district court has committed clear error. *Katie*, 481 F.3d at 1155.

The majority concedes this is a close case. Maj. Op. at 10439. Factual determinations in close cases are the function of the trial court, not the court of appeals, and especially not where our standard of review is for clear error. Clear error means it is not a close case. Because there is evidence in the record supporting each of the district court's factual findings, I see no way we can say the district court committed clear error, thus I respectfully dissent.