**UNITED STATES of America, Plaintiff,**

v.

**Randall FOX, Defendant.**

**NO. CR16–100RSL**

United States District Court,
W.D. Washington,
at Seattle.

Signed 10/25/2016

---

that might exist at the cruise terminal, since CTA was not properly notified of this activity.

James D. Oesterle, US Attorney's Office, Seattle, WA, for Plaintiff.

Dennis Carroll, Federal Public Defender's Office, Seattle, WA, for Defendant.

## ORDER GRANTING IN PART DEFENDANT RANDALL FOX'S MOTION TO SUPPRESS STATEMENTS

Robert S. Lasnik, United States District Judge

This matter comes before the Court on defendant Randall Fox's "Motion to Suppress Oral Statements Made to Law Enforcement in Violation of Miranda v. Arizona." Dkt. #40. Having reviewed the memoranda and exhibits submitted by the parties, and having heard the testimony of Special Agent Richard Vanlandingham and oral argument by the parties, the Court finds as follows.

### BACKGROUND

Defendant Randall Fox is charged with one count of conspiracy (under 18 U.S.C. § 371) and one count of Act to Prevent Pollution from Ships oil discharge violation (under 33 U.S.C. § 1908(a), 18 U.S.C. § 2,

and 33 C.F.R. §§ 151.10(a–b), 155.350). Dkt. # 4 at 4–5, 7–8. The government alleges that defendant and his father, Bingham Fox, knowingly operated Bingham Fox's boat, the *F/V Native Sun*, without a functioning system to separate oily water from water, and knowingly discharged oil into navigable waters in potentially harmful quantities. Dkt. # 4 at 5. Defendant moves to suppress statements he made to Coast Guard investigators during the Coast Guard's 2013 vessel inspection of the *F/V Native Sun.*

That inspection transpired as follows. Around 4:30am on September 8, 2013, ten Coast Guard agents—Special Agents Richard Vanlandingham and Scott Trotter, Chief Warrant Officer Gary Medina, and seven others, including four uniformed, armed security officers—arrived at the dock where the *F/V Native Sun* was mooring to investigate reports that someone had been discharging oil from aboard the boat. Oral Testimony of Richard Vanlandingham (October 20, 2016) ("Vanlandingham Testimony"); Dkt. # 50, ¶¶ 6–7. The agents ordered the crew (including defendant, the vessel's captain) to exit the boat and stand on the dock while the Coast Guard security officers conducted a sweep of the boat. Vanlandingham Testimony; Dkt. # 50, ¶ 7.

After the security sweep concluded, Special Agent Vanlandingham, Special Agent Trotter, and Officer Medina informed defendant that they were conducting a preliminary investigation into allegations of a possible sewage/pollution discharge. Def. Pre–Trial Exhibit 507. Officer Medina told defendant that he would be interviewing each crew member individually, and that defendant, as the vessel's captain, would be interviewed twice—first and last. Id.

Officer Medina asked defendant to accompany him, Special Agent Vanlandingham, and Special Agent Trotter to the boat's wheelhouse for the first interview.

Dkt. # 50, ¶ 9. The dimensions of the wheelhouse are approximately ten feet by twelve feet, and the wheelhouse has an exit door on both the port and starboard sides. Vanlandingham Testimony; Gov't Pre–Trial Exhibit 5.2 (photo of port side); Gov't Pre–Trial Exhibit 5.3 (photo of starboard side); Dkt. # 50, ¶ 9. During the first interview, defendant stood near the boat's helm, while the three Coast Guard agents stood in the aft of the wheelhouse, leaving the exit doors unobstructed. Dkt. # 50, ¶ 9. Both Special Agent Vanlandingham and Special Agent Trotter were armed, though neither was in uniform, and their weapons were not openly displayed. Vanlandingham Testimony.

Officer Medina led the interview with defendant. Dkt. # 50, ¶ 9. He asked defendant a series of questions about defendant's time on the boat, the boat's recent trips, and the other crew members. See generally Def. Pre–Trial Exhibit 504.2–504.12 (transcript of first interview); Dkt. # 50, Ex. 1 (recording of first interview). Defendant informed Officer Medina that he was living on the boat for the time being. Def. Pre–Trial Exhibit 504.7. Officer Medina asked defendant if he had ever discharged oily products overboard, to which defendant responded "absolutely not." Def. Pre–Trial Exhibit 504.8, 504.9. Officer Medina closed the ten-minute initial interview by asking defendant to return to the dock. Def. Pre–Trial Exhibit 504.12.

After Officer Medina had interviewed the other crew members, he met with the rest of the Coast Guard team, who explained that they had discovered a blue discharge hose connected to a submersible pump. This pump was placed in the bilge of the engine room, and the blue hose led overboard. The engine room bilge contained oily water; oil was evident on both the pump and the hose. The team found a

second pump and hose, also leading overboard from the bilge, in another part of the engine room. Vanlandingham Testimony; Dkt. # 50, ¶ 10; Def. Pre–Trial Exhibit 507.

Officer Medina called defendant for his second interview, again attended in the wheelhouse by Special Agents Vanlandingham and Trotter. As before, defendant stood near the helm, while the three agents stood aft, leaving the two exit doors clear. Vanlandingham Testimony; Dkt. # 50, ¶ 10; Def. Pre–Trial Exhibit 507. Immediately after beginning the interview, Officer Medina informed defendant that

> we've identified that your blue hose down below has oil in it. And it's attached to a pump, which we just saw a few minutes ago, that goes down to the bilge, down to the engine room.

Def. Pre–Trial Exhibit 504.12. Officer Medina then asked defendant a number of questions about the hose and pump, which defendant answered at length. Def. Pre–Trial Exhibit 504.12–504.19. In response to one of defendant's answers about how long the hose and pump had been in place, Officer Medina told defendant that

> Now, like I said, we talk to everybody, you know, and the consensus I would say through everybody is it's been like this for a long time. . . . Not just for now. It's not only a week or two. It's been like this for a long time.

Def. Pre–Trial Exhibit 504.20. When asking defendant how many times he had used the bilge pump, Officer Medina informed defendant that he'd "been down in the engine room and [had] looked around and [had] a fair number in [his] head. . . . Because from what we understand from the crew or from other folks too is that those bilges fill up pretty quick." Def. Pre–Trial Exhibit 504.25. Later in the interview, Officer Medina told defendant that

> these are my facts that I have: You're the captain of this boat. . . . We found oil

in your bilge hose that you—that somebody has set up to go overboard. We found that oil in that hose, that's a fact. We found a pump attached to that hose, that's a fact. You have physically and verbally told me that you've pumped it over at least a couple of times every other day. That's a fact.

Def. Pre–Trial Exhibit 504.42. After defendant stated that he did not know whether an inspection of the hose would produce oil, Officer Medina told defendant that "We pulled oil out of it. So that means that oil is coming out of that discharge hose." Def. Pre–Trial Exhibit 504.43. The second interview lasted about forty minutes. Dkt. # 50, Ex. 3 (recording of second interview). In total, the Coast Guard vessel inspection team remained on the *F/V Native Sun* for roughly four and a half hours. Vanlandingham Testimony.

During the vessel inspection, the agents never issued <u>Miranda</u> warnings or told defendant that he was free to leave or to end the questioning; defendant never attempted to end the interviews. Dkt. # 50, ¶ 10. Defendant argues that the statements he made during the two interviews should be suppressed as products of an un-Mirandized custodial interrogation.

## DISCUSSION

▇▇▇ The Fifth Amendment right against self-incrimination requires the exclusion of statements elicited in a custodial interrogation unless the suspect was first issued warnings pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Whether an officer must deliver <u>Miranda</u> warnings before interrogating a suspect depends on whether the suspect is "in custody" at the time of the questioning. <u>United States v. Kim</u>, 292 F.3d 969, 974 (9th Cir. 2002). " '[C]ustody' is a term of art that specifies circumstances that are thought generally

to present a serious danger of coercion." Howes v. Fields, 565 U.S. 499, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012).

■ To determine whether a suspect was in custody, a court looks at all of the objective circumstances of the interrogation and asks whether the law enforcement officers "established a setting from which a reasonable person would believe that he or she was not free to leave." Kim, 292 F.3d at 973–74 (quoting United States v. Beraun–Panez, 812 F.2d 578, 580 (9th Cir. 1987)). Relevant circumstances include (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. Id. at 974.

■ Applying those factors to this case, the Court concludes that, during the second interview on September 8, defendant was in custody for Miranda purposes.[1]

**1. The language used to summon defendant.**

■ "In determining whether suspects were 'in custody' for Miranda purposes, the Supreme Court has considered whether they voluntarily approached or accompanied law enforcement officers *understanding that questioning would ensue.*" Kim, 292 F.3d at 974 (emphasis in original). The language used by law enforcement to invite—or compel—a suspect to an interview sheds light on whether the suspect's attendance was truly voluntary. See United States v. Bassignani, 575 F.3d 879, 884 (9th Cir. 2009).

■ In this case, defendant was not exactly "summoned" by law enforcement: rather, the ten-person Coast Guard vessel inspection team was waiting at the dock to meet the *F/V Native Sun* as it moored before sunrise. With the rest of his crew, defendant was ordered onto the dock while armed agents performed a security sweep of the boat. Under these circumstances, defendant did not "voluntarily approach" law enforcement "for the very purpose, known in advance, of answering their questions." See Kim, 292 F.3d at 974–75 (contrasting a suspect who, at law enforcement's request, voluntarily goes to the station for questioning, with a suspect who voluntarily goes to work only to discover police surrounding her workplace).

■ It is true that, upon encountering the Coast Guard officers, defendant agreed to accompany Officer Medina into the boat's wheelhouse, and defendant does not dispute that the Coast Guard team treated him and his crew with courtesy. A reasonable person in defendant's circumstances would have reason to expect that, after following the agents into the wheelhouse, questioning would ensue. But acquiescence to a polite request does not necessarily indicate truly voluntary compliance, particularly when the request comes from law enforcement officers already present at the suspect's place of work. See Bassignani, 575 F.3d at 884 (weighing first factor in favor of custody where plainclothes officers "instructed" suspect to go into a conference room at suspect's workplace for questioning).

---

1. It is undisputed that the Coast Guard was legally authorized to board and investigate the *F/V Native Sun* for compliance with safety and environmental laws and regulations. 14 U.S.C. § 89(a); 33 C.F.R. § 151.23(a)(2)–(3). While this investigative authority permits Coast Guard agents to interview crew members, those investigative interviews must nonetheless comply with the Fifth Amendment. See United States v. Baker, 641 F.2d 1311, 1319 (9th Cir. 1981) (analyzing whether "routine Coast Guard boarding" created a custodial atmosphere requiring Miranda warnings before interrogation).

And even where a suspect voluntarily accompanies police to a specific location, if "once there, the circumstances become such that a reasonable person would not feel free to leave, the interrogation can become custodial." Kim, 292 F.3d at 975. That is what happened here. Upon reboarding the boat for his first interview, defendant was told that he would be interviewed a second time, at the very end of the Coast Guard's investigation. Particularly as the captain of the vessel under inspection, a reasonable person would not have felt free to leave the area before the initiation of his second interview. Thus, the Court concludes that, however voluntary defendant's initial entrance to the wheelhouse might have been, by the time his second interview began, defendant's freedom to depart was restricted. See Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); Bassignani, 575 F.3d at 884.

**2. The extent to which the defendant is confronted with evidence of guilt.**

A finding that law enforcement confronted a suspect with evidence of his guilt weighs in favor of a determination that the suspect was in custody. United States v. Lee, 699 F.2d 466, 468 (9th Cir. 1982) (per curiam) (holding that suspect was in custody where agents allowed suspect "to repeat his exculpatory story," then "confronted him with evidence of his guilt"). Defendant was not presented with any evidence during his first interview. As to defendant's second interview, the government concedes that Officer Medina presented defendant with the submersible pumps and hoses that the Coast Guard agents found during their inspection, but contends that this factor nonetheless weighs against custody because the agents "did not present [defendant] with evidence of his guilt" and because they did not use "aggressive or coercive tones." Dkt. # 49 at 9 (citing United States v. Beraun–Pa-

nez, 812 F.2d 578, 579 (9th Cir. 1987)). Contrary to the government's assertions, however, Officer Medina did challenge whether defendant was lying by presenting him with evidence of his guilt, through statements such as, "We found oil in your bilge hose that you—that somebody has set up to go overboard. We found that oil in that hose, that's a fact." Def. Pre–Trial Exhibit 504.42. The Court finds that these interview tactics weigh in favor of custody. See United States v. Norris, 428 F.3d 907, 913 (9th Cir. 2005) (finding that suspect was not in custody where agents "did not attempt to challenge [suspect's] statements with other 'known facts' suggesting his guilt").

**3. The physical surroundings of the interrogation.**

"An interrogation conducted in familiar surroundings weighs against a finding that the defendant was in custody." Bassignani, 575 F.3d at 885 (finding that setting of interview, defendant's workplace, weighed against a finding of custody); see also United States v. Eide, 875 F.2d 1429, 1437 (9th Cir. 1989) (holding that an interrogation conducted in familiar surroundings weighs against a finding that the defendant was in custody). Here, defendant was questioned in a very familiar space: the wheelhouse where he worked, and, indeed, where he slept.

Still, even a setting as familiar as a workplace can become custodial where law enforcement "[takes] over complete control" such that the workplace becomes "a police-dominated atmosphere." Kim, 292 F.3d at 977. And the "usual inquiry into whether the suspect reasonably believed he could 'leave' the interrogation does not quite capture the uniqueness of an interrogation conducted within the suspect's home." United States v. Craighead, 539 F.3d 1073, 1082 (9th Cir. 2008). "[A] reasonable person interrogated inside his own

home may have a different understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search." Id. at 1083. Here, where law enforcement outnumbered crew members two to one, and where defendant had reason to believe that he could not "empty his home of his interrogators until they [had] completed their search," id. the Court concludes that the Coast Guard created a "police-dominated atmosphere" that vitiated the ordinary security of defendant's familiar surroundings. See Kim, 292 F.3d at 977. This factor weighs in favor of a finding of custody.

**4. The duration of the detention.**

The length of the interrogation also bears on whether the suspect was in custody. Kim, 292 F.3d at 974. The Ninth Circuit has found a defendant in custody where an interrogation lasted 45–50 minutes, and where the "entire detention lasted over 90 minutes," id. at 981; it has declined to find custody, however, where an interrogation lasted "more than an hour," United States v. Crawford, 372 F.3d 1048, 1052 (9th Cir. 2004). In this case, defendant's first interview lasted ten minutes, weighing against a finding that the first interview was custodial. Defendant's second interview lasted forty minutes—surely not "a marathon session designed to force a confession," Bassignani, 575 F.3d at 886 (quoting Davis v. Allsbrooks, 778 F.2d 168, 171 (4th Cir. 1985)). Still, the Coast Guard's investigation had been ongoing for at least two hours by the time Officer Medina initiated defendant's second interview, and as summarized above, a reasonable person in defendant's shoes likely would not have felt free to leave the area for the duration of the investigation—roughly four and a half hours, in total. As to the second interview, this factor weighs in favor of custody.

**5. The degree of pressure applied to detain the individual.**

We must finally consider the degree of pressure applied to detain defendant. Kim, 292 F.3d at 981. Defendant was neither handcuffed nor barricaded in the wheelhouse; the agents never told him or the other crew members that they were not free to leave. And the presence of many officers conducting a search cannot, without more, establish a custodial situation. Id.; United States v. Baker, 641 F.2d 1311, 1319 (9th Cir. 1981) (recognizing that "[g]enerally, routine Coast Guard boarding of vessels does not create a custodial situation requiring Miranda warnings before interrogation"). Still, considering the totality of the circumstances—the armed security sweep preceding the interviews, the continued presence of armed officers on the boat, the exclusion of other crew members from the wheelhouse for the duration of defendant's interview, the knowledge that a second interview would follow the first at the conclusion of the agents' investigation, and the additional responsibility for the boat borne by defendant as captain—the Court concludes that the Coast Guard applied pressure to prevent defendant from leaving either before or during his second interview.

All things considered, a reasonable person in defendant's situation would not have felt free to end (or to skip) the second interview and leave. Thus, the objective circumstances of defendant's September 8th, 2013 interview lead to the conclusion that, during his second interview, defendant was in custody for the purposes of Miranda. Defendant's un-warned statements from the Coast Guard's second interview must be suppressed as elicited in violation of the Fifth Amendment. Miranda, 384 U.S. at 444–45, 86 S.Ct. 1602.

The Court does not find, however, that defendant's will was overborne by the circumstances of his questioning. United

States v. Preston, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc). Because the Coast Guard's second interview violated the Fifth Amendment but not the Fourteenth, defendant's statements may be used for impeachment purposes, if defendant chooses to testify. See United States v. Patane, 542 U.S. 630, 639–40, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004).

## CONCLUSION

For the all the foregoing reasons, defendant Randall Fox's motion to suppress (Dkt. # 40) is GRANTED in part.