Filed 6/5/25  P. v. Koerber CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>RONALD GENE KOERBER,<br><br>　　　Defendant and Appellant. | D085453<br><br><br><br>(Super. Ct. No. FSB21004312) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Steve Malone, Judge.  Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Arlyn Escalante, Deputy Attorneys General, for Plaintiff and Respondent.

On July 8, 2021, Jose Torres left his home and never returned. Three days later, his decomposing body was found in an RV owned and occupied by Ronald Gene Koerber.  A jury found Koerber guilty of the first

degree murder of Torres (Pen. Code, §187, subd. (a); count 1), but found untrue allegations that he personally used a firearm in the commission of the offense (§ 12022.53, subds. (b)-(d)).  Koerber raises six challenges to the verdict on appeal.

First, Koerber contends the evidence was insufficient to merit a jury instruction on aiding and abetting, requiring reversal of his conviction.  We conclude, however, substantial evidence supported giving the instruction.

Second, Koerber contends there is insufficient evidence of premeditation and deliberation to support a first degree murder conviction.  We disagree.  Viewing the evidence in the light most favorable to the judgment and drawing all reasonable inferences in its favor, there is sufficient evidence of motive, manner of killing, and planning to support Koerber's first degree murder conviction as an aider and abettor.

Third, Koerber claims the court prejudicially erred in excluding evidence that law enforcement initially thought their primary suspect was still outstanding.  Such opinions as to a defendant's innocence or guilt, however, are irrelevant.  Accordingly, the court did not abuse its discretion in excluding this evidence.

Fourth, Koerber argues statements made during his standoff with law enforcement were inadmissible because it amounted to a custodial interrogation, yet he was not read his rights under *Miranda v. Arizona* (1966) 384 U.S. 436.  We conclude on the evidence here Koerber was not in custody for *Miranda* purposes, so this claim fails.

Fifth, Koerber argues his counsel provided constitutionally deficient representation in failing to request a pinpoint instruction following a jury question.  But Koerber fails to clear the high hurdle to establish ineffective assistance of counsel on direct appeal.

2

Finally, Koerber claims cumulative error requires reversal. As we find no error, however, this claim is doomed.

We thus affirm the judgment.

## I.

## A.

On July 11, 2021, an employee of a recycling center located behind a grocery store noticed an RV blocking access to one of the recycling containers. The employee approached the RV to request it be moved but noticed what looked like blood pooling on the ground and an odor, so he called 911 instead.

The first law enforcement officers on scene also identified what appeared to be blood seeping from "the seam of the RV" and the odor of decomposition. They circled the RV, identifying themselves and requesting a response from any occupants. They saw Koerber look through the drapes over the RV windshield and then disappear from view. The officers requested backup, including a crisis negotiation team.

During this time, Koerber sent an acquaintance a series of text messages, including, "I'm in trouble at [the grocery store] with sheriff's department outside." He also texted, "I'm finished this time. No second chances. I have body still in RV. I'm facing murder. Can't go to jail. I'm going to have to go suicide by cop."

The acquaintance went to the location and told law enforcement she had been in contact with Koerber and that she might be able to get him to come out if they let her talk to him, but they refused the offer. She sent a text message trying to convince Koerber to speak with law enforcement. He responded, "I won't talk to them. Why should I? I'm going to jail."

But when a crisis negotiator called Koerber's cell phone number, he answered. The crisis negotiator spoke with Koerber—first on Koerber's cell

phone and, when his battery nearly died, on a "throw phone"—for roughly three hours, trying to convince him to peacefully exit the RV.

Once officers determined Koerber was unlikely to come out willingly, they disabled the RV by removing the windshield and the steering wheel. This infuriated Koerber. Officers then deployed tear gas in the back of the RV. Koerber exited the RV through the windshield void, holding a long knife and yelling for officers to shoot him.

Koerber ran toward a fence, beyond which was an apartment complex. After officers shot at Koerber with 40-milimeter blunt impact projectiles and tasers, a canine apprehended Koerber. Koerber was taken to the hospital, where he told an officer he "didn't do it" but he was "involved," so he was "just as guilty." He said he "just got a call to help" someone with a "situation he [wa]s involved in," but when asked if he was "the cleaner," he responded, "No."

B.

Inside the RV was a large, plastic bin with a blanket on top. Under the blanket was a suitcase with part of a human foot sticking out of it. Torres' body was wrapped in a bloodstained rug inside the suitcase.

The interior of the RV also contained cleaning supplies, including an empty container of bleach and bloodstained rags. The RV contained no bullet strikes, blood spatter, or signs of struggle.

In a compartment accessible from the outside of the RV, law enforcement found three or four trash bags. Inside the trash bags, among other things, were bloodstained pillows and pillowcases, bloody pieces of laminate flooring, a pair of rubberized gloves, multiple pairs of latex gloves, bloodstained clothing, pieces of drywall or other debris, and a knife with a

4

bloodstained tip.  DNA testing confirmed to a high degree of probability it was Torres' blood.

Law enforcement recovered, among other things, Koerber's cell phone and knife from the area of apprehension.  Very little data was recovered from the cell phone, and there were indications messages had been deleted.

Law enforcement recovered no firearms from the scene.

C.

Fingerprints taken from the body revealed the victim was Torres. Torres had left his home the afternoon of July 8, 2021, and his wife had not seen or heard from him since.

The forensic pathologist who examined Torres' body testified the body was moderately decomposed, so he could not ascertain how long Torres had been dead.

The forensic pathologist documented two injuries.

The first was a gunshot wound of the head.  The bullet entered from the back right side of the top of the head and travelled "to the left and downwards," exiting from the back left side of the head.  Around the wound, there was no stippling—small dots of unburned gunpowder—that could indicate a closer-range shooting.  Nor was there soot—burned gunpowder—to indicate a very close-range shooting.  The forensic pathologist did not commit to a range of fire, however, because the lack of stippling and soot could not rule out a close-range shooting.

The second injury was a stab wound of the neck.  It was about 2.6 centimeters long and 4.5 centimeters in depth.  It began on the right side of the neck and the direction of the wound was "right to left, upward and slightly front to back."  The stabbing implement "didn't strike anything immediately lethal" because it went "into the muscle of the neck" rather than

5

a major vessel. The forensic pathologist could not determine what implement was used, although it was "[s]omething akin to a knife, a sharp implement." The forensic pathologist also could not determine what position Torres was in when stabbed or whether he was moving or stationary. Nor could the forensic pathologist determine whether the stabber was right- or left-handed.

Because of the state of decomposition, the forensic pathologist could not determine which wound was inflicted first, although he indicated it was "less likely" the stab wound was the second injury. Torres was alive when the gunshot wound was sustained. The gunshot wound would have resulted in death in a period of seconds, although death could have taken more than a minute. The stab wound "would not have been lethal in this case because of the presence of the gunshot wound." Torres' body bore no defensive wounds.

D.

Koerber was charged with murder (Pen. Code § 187, subd. (a); count 1), with allegations he personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm, proximately causing great bodily injury and death (§ 12022.53, subds. (b)-(d)); and resisting an executive officer (§ 69; count 2).

A jury trial was held as to count 1 only. During the trial, the above evidence was presented to the jury. Additionally, the prosecutor asked one of the homicide detectives if he had "heard of the term 'the cleaner'" and whether he thought "this was like a cleaner situation." The detective responded affirmatively to both questions. On recall, the detective clarified that Koerber's actions were not indicative of him being the cleaner, who would "get rid of evidence immediately."

The jury posed three questions during deliberations, but only the last two are relevant here. The jury's second question asked for "[m]ore

6

clarification on murder one + murder two, how [ai]ding + abet[t]ing correspon[d]s." The court directed the jurors to the relevant jury instructions. The third question requested a readback of Koerber's acquaintance's testimony, which the jury received.

Ultimately, the jury found Koerber guilty of first degree murder but found the firearm allegations not true.

## II.

We address Koerber's appellate arguments in turn.

## A.

First, Koerber contends there was insufficient evidence to merit a jury instruction on a theory of aiding and abetting and the error was prejudicial. We conclude sufficient evidence warranted the instruction; accordingly, we need not reach the parties' prejudice arguments.

"A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof." (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.) "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

We review de novo the trial court's decision to give or refuse a jury instruction. (*Cole*, 33 Cal.4th at p. 1206.) Thus, here, "we must determine whether a reasonable trier of fact could have found beyond a reasonable doubt that [Koerber] committed murder based on a[n aiding and abetting] theory." (*Ibid.*)

To establish a defendant aided and abetted a crime, the People must prove (1) "[t]he perpetrator committed the crime"; (2) "[t]he defendant knew

7

that the perpetrator intended to commit the crime"; (3) "[b]efore or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime"; and (4) "[t]he defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime." (CALCRIM No. 401.)

Koerber concedes whoever perpetrated the crime murdered Torres, and the evidence also supports a finding Koerber was not the direct perpetrator yet was involved in the crime itself. While at the hospital, Koerber told a law enforcement officer he "didn't do it"—i.e., kill Torres—but was "involved" and therefore "just as guilty." He claimed to have received "a call to help" someone with a "situation he [wa]s involved in" but denied being "the cleaner." From Koerber's statements, a jury could reasonably conclude that, while Koerber did not fire the fatal shot, he was involved in Torres' killing to a degree greater than that of a mere accessory after the fact who cleaned up post-killing. Contrary to Koerber's claim on appeal, he never said "he was not involved in the killing" or "the killer asked [him] to dispose of the body." Indeed, the text message Koerber sent his acquaintance acknowledging he was "facing murder" further corroborates Koerber's implication in the murder and not simply the cleanup.

Physical evidence further supports Koerber's involvement. Torres' decomposing and stabbed body was found in Koerber's RV. A knife—the tip of which was stained with Torres' blood—also was recovered from Koerber's RV, but no firearm was found in the RV or nearby. Koerber claims the knife "was found in a bag that included other items that were saturated with the victim's blood and bodily fluids" and that the criminalist "tested only 'the blade' of the knife for DNA and not the tip," so it is not reasonable to infer that knife was used to stab Torres. Yet the criminalist's use of the generic

8

word "blade" does not exclude the possibility the swabs were from the tip of that blade. To the contrary, the record shows the swabs were taken "from the bloodstains on that knife," which the evidence establishes were on the blade's tip.

A jury could reasonably infer from Koerber's statements and the physical evidence that he was not merely an after-the-fact cleaner but that he wielded the knife and stabbed Torres before or while a third party fired the gun. The jury could further infer from this evidence that (1) Koerber must have known the perpetrator—who specifically elicited Koerber's "help" with a "situation"—intended to kill Torres, and (2) Koerber intended to and did aid and abet the crime with malice by responding to that call for help and stabbing Torres in a vital area like his neck. We find Koerber's arguments to the contrary unavailing.

Koerber labels this interpretation of the evidence "pure fantasy." We disagree. As the People argue, these are facts supported by the record evidence or inferences reasonably drawn from those facts, not mere conjecture. While Koerber claimed not to have killed Torres, the above evidence and reasonable inferences drawn therefrom could support a finding otherwise. While contrary reasonable inferences could be drawn from the evidence, in assessing substantial evidence, we merely ascertain that it exists. It is for the jury to choose between potential competing inferences. (*People v. Williams* (2018) 23 Cal.App.5th 396, 408.)

On this record, we conclude there was sufficient evidence for the court to instruct on aiding and abetting. (See *People v. Morse* (1992) 2 Cal.App.4th 620, 635, 649-650 [finding slim but sufficient evidence warranted aiding and abetting instruction where bulk of evidence established defendant in murder and reckless or malicious possession of destructive device prosecution created

9

and intended to use bomb, yet defendant denied knowledge of bomb, defendant's brother's fingerprint was found along with defendant's on cover of *The Anarchist Cookbook*, and evidence established defendant held weekly garage sales giving others access to space where bomb was found].)

B.

Second, Koerber claims there is insufficient evidence of premeditation and deliberation to support his conviction of first degree murder. We determine otherwise.

1.

We review claims of insufficient evidence under the substantial evidence standard. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) In a criminal case, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) Such evidence can include not only circumstantial evidence, but also all reasonable inferences drawn from it. (*People v. Soriano* (2021) 65 Cal.App.5th 278, 286.) "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*Thomas*, at p. 516.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187(a).) By default, murder is in the second degree. (§ 189(b).) A killing that is "willful, deliberate, and premeditated," however, is murder in the first degree. (§ 189(a).) Premeditation "encompasses the idea that a defendant thought about or considered the act beforehand." (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) Deliberation

10

refers to the careful weighing of considerations in forming a course of action. (*Ibid.*) Thus, "[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) Above all, "[t]he true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." (*People v. Thomas* (1945) 25 Cal.2d 880, 900.)

In assessing the sufficiency of the evidence of premeditation and deliberation, a reviewing court typically analyzes three categories of evidence: (1) "'planning' activity" prior to the killing, showing the defendant engaged in acts intended to result in the death; (2) "'motive'"; and (3) "the nature of the killing," including whether the manner of killing was "so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design.'" (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) Evidence of premeditation and deliberation is likely sufficient if it includes (1) some "evidence of all three types," (2) "extremely strong evidence" of planning, or (3) evidence of motive with evidence of either planning or manner of killing. (*Id.* at p. 27.) Yet these "guidelines are descriptive," are "neither normative nor exhaustive," and "need not [be] accord[ed] . . . any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

2.

Viewing the evidence in the light most favorable to the judgment of conviction and presuming the existence of every inference the jury could reasonably have drawn from the evidence (*People v. Southard* (2007) 152 Cal.App.4th 1079, 1085), we conclude sufficient evidence of

11

premeditation and deliberation supports Koerber's conviction of first degree murder on an aiding and abetting theory.

Contrary to Koerber's claim that "there was no evidence to support any of the *Anderson* prongs," the jury could infer Koerber's aiding and abetting of the killing of Torres was deliberate and premeditated from the record evidence.

While Koerber argues no motive for the killing was apparent, the record establishes Koerber became involved in the "situation" to "help" someone, and not simply as an after-the-fact cleaner. This evidence and inference of motive are admittedly weak yet are nonetheless some evidence of motive.

The exacting manner of killing, meanwhile, evinces planning and coordination, therefore supporting a conclusion that Torres' killing resulted from deliberation and premeditation. While Koerber argues otherwise, the evidence reveals much more than the simple fact Torres was killed. Torres died from a single gunshot wound to the head that the forensic pathologist testified would have been fatal in seconds. Torres also had a puncture wound to the neck roughly two inches deep—not, as Koerber claims, a mere "'defect in the skin.'" Torres had no defensive wounds. As the lack of defensive wounds suggests Torres had no opportunity to defend himself, a jury could reasonably infer the two wounds were inflicted either simultaneously or in short succession, indicating a level of coordination between the killer and the stabber requiring some degree of preplanning. That Torres' death resulted from only two precise wounds to different vital areas further suggests the killer and Koerber had time to reflect before inflicting such intentional injuries. (See *Anderson,* 70 Cal.2d at p. 27 ["directly plunging a lethal

12

weapon into the chest evidences a deliberate intention to kill as opposed to" an "'indiscriminate' multiple attack of both severe and superficial wounds"].)

The cases on which Koerber relies to claim insufficient evidence of premeditation and deliberation are distinguishable. For example, in *People v. Rowland* (1982) 134 Cal.App.3d 1, 9, the lack of *any* evidence of motive or exacting manner of killing, when coupled with only "minimal evidence of planning," was considered insufficient to support a first degree murder conviction. But here the jury was presented with evidence of manner of killing showing preplanning and some evidence of motive. *People v. Craig* (1957) 49 Cal.2d 313, meanwhile, predates *Anderson* and therefore does not engage with the factors on which Koerber so heavily relies; indeed, the word "planning," for which Koerber cites the case, does not appear in *Craig* at all. At any rate, *Craig* merely stands for the proposition that when "'nothing further is shown'" beyond proving the defendant murdered the victim, the verdict should be second, rather than first, degree murder. (*Id.* at p. 319.) Finally, Koerber's statement that our Supreme Court "has held the prosecutor's argument that 'premeditation and deliberation may be inferred from the condition of the body and other physical evidence' is 'totally devoid of merit'" misreads the passage in *Anderson*, which was limited to "[t]he Attorney General's argument . . . in the instant case." (*Anderson*, 70 Cal.2d at p. 30.) Indeed, sometimes, manner-of-killing evidence alone may be sufficient proof of premeditation and deliberation. (See, e.g., *People v. Hawkins* (1995) 10 Cal.4th 920, 957 [execution-style murder evinced premeditation and deliberation].)

In sum, under our deferential standard of review, the record evidence was sufficient to convict Koerber of first degree murder on an aiding and

13

abetting theory. Given this conclusion, we need not reach the parties' arguments as to prejudice.

C.

Third, Koerber argues the court prejudicially erred in excluding evidence that law enforcement originally thought he was an accessory after the fact and that the actual killer was still at large. We disagree.

1.

Early in the investigation, one investigating detective sent an e-mail to another law enforcement department to obtain license plate reader data for Koerber's and Torres' vehicles. In it, he stated: "We believe the suspect we have in custody was helping to hide the body, and our primary suspect is outstanding."

The People moved to exclude the detective's statement, among other reasons, (1) as an improper legal opinion and (2) under Evidence Code section 352. Koerber sought to admit the e-mail to explain the investigatory steps law enforcement took in the case and why. During a section 402 hearing, the detective stated law enforcement thought at the time Koerber "could" be the primary suspect but "potentially there was another person involved just based on statements" made by Koerber. He noted he now believed Koerber was the only involved suspect based on the totality of the investigation.

Although the court found the *facts* of the investigation relevant to establishing a lack of investigation, it concluded the statement in question was an irrelevant *opinion* of Koerber's guilt or innocence. The court noted it would have excluded an opinion Koerber was guilty and this "works the same for both sides." The court further found the statement inadmissible under section 352 because its admission would have obligated the court "to allow

14

the prosecution to then have [the detective] lay out all the reasons why he thinks the defendant is guilty. And that would be more prejudicial."

2.

"We review the trial court's rulings on the admission of evidence for abuse of discretion." (*People v. Cowan* (2010) 50 Cal.4th 401, 462.) Our focus is the court's ruling, not its reasoning, and we will affirm if the ruling is correct on any ground. (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11.)

"A consistent line of authority in California as well as other jurisdictions holds a witness cannot express an opinion concerning the guilt or innocence of the defendant." (*People v. Torres* (1995) 33 Cal.App.4th 37, 46.) An opinion as to the defendant's guilt or innocence is irrelevant, as it provides no useful data to the jury to use in its evaluation of the evidence. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.) This is particularly so while the investigation is ongoing and the state of the evidence in flux. Irrelevant evidence is inadmissible. (Evid. Code, § 350.)

Koerber denies the statement opines as to Koerber's guilt or innocence, contending it demonstrates the investigatory steps taken by law enforcement. According to him, the statement was thus helpful and admissible because it corroborated the defense theory that Koerber was not the killer but at most an accessory after the fact. We disagree. What any given officer believed as to the defendant's culpability at a historic point in time is not a step in the investigation but simply an opinion. The cases on which Koerber relies involving steps in the investigation are therefore distinguishable.

Because we conclude the statement was irrelevant opinion testimony as to Koerber's guilt or innocence, the trial court did not err in excluding it. The cases Koerber cites involving opinion as to (1) the identity of persons in surveillance videos or photographs, (2) gang issues, and (3) lineups are

15

distinguishable because they *do* assist the jury in its factfinding role. The opinions in those cases were still held at the time of the relevant testimony, whereas here the opinion was historic and out of line with the detective's present views.

Even were the evidence relevant, we would conclude the trial court acted within its discretion in excluding it under section 352, which allows even relevant evidence to be excluded if its probative value is substantially outweighed by prejudice, delay, or confusion. Here, the opinion likely would have confused the jury and prolonged an already lengthy trial.

Given the court's ruling was correct, we need not opine on its reasoning. (See *Zamudio*, 43 Cal.4th at p. 351, fn. 11.) Thus, to the extent Koerber claims the court misapprehended the relevant law, we need not reach the issue. And because we find no error, we need not address prejudice.

D.

Fourth, Koerber claims his standoff with law enforcement was a custodial interrogation for *Miranda* purposes, and because he was not read his rights the court prejudicially erred in admitting statements he made at the time. We are unconvinced.

"'Before being subjected to "custodial interrogation," a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."'" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1399-1400, quoting *People v. Mayfield* (1997) 14 Cal.4th 668, 732.) "For *Miranda* purposes, custodial status arises if a person has been 'taken into custody or otherwise deprived of his [or her] freedom of action in

16

any significant way.'" (*People v. Elizalde* (2015) 61 Cal.4th 523, 531, quoting *Miranda*, 384 U.S. at p. 444.)

On appeal, "we accept the trial court's factual findings, based on its resolution of factual disputes, its choices among conflicting inferences, and its evaluations of witness credibility, provided that these findings are supported by substantial evidence." (*Mayfield*, 14 Cal.4th at p. 733.) "But we determine independently, based on the undisputed facts and those properly found by the trial court, whether the challenged statements were legally obtained." (*Ibid.*)

The parties cite to, and this court has located, no California cases directly addressing whether a defendant engaged in a non-hostage standoff with law enforcement is in custody for *Miranda* purposes. Appellate courts in other states, however, have found such standoffs noncustodial. (See, e.g., *State v. Conner* (N.C.Ct.App. 2022) 283 N.C.App. 253, 257 [collecting cases].) We find these cases persuasive and, upon assessing the ten factors relevant to this determination identified by Koerber ("(1) the language used to summon the suspect to questioning; (2) the length of the detention; (3) the location of the detention; (4) whether the police officers outnumbered the suspects; (5) the demeanor of the officers and whether the nature of their questions was accusatory or confrontational; (6) whether the suspect was confronted with evidence of his [or her] guilt during the questioning; (7) whether the suspect was told he [or she] could leave; (8) whether the suspect was restrained and whether the officers controlled the environment; (9) whether the interrogation focused on the suspect; and (10) whether the suspect was arrested at the conclusion of the interrogation"), we conclude Koerber was not in custody.

First, while Koerber did not initiate contact with law enforcement, who knocked and repeatedly asked him to come out before calling him on his cell

phone, Koerber was never told he was under arrest during his voluntary communications with the crisis negotiator. In fact, he was expressly told he was *not* under arrest. Second, although Koerber talked with the crisis negotiator for roughly three hours, Koerber himself prolonged the encounter by repeatedly refusing law enforcement's attempts to get him to exit the RV voluntarily. These factors are more or less neutral.

Meanwhile, the questioning took place in Koerber's own, familiar RV, and he was not prevented from communicating with others. (*United States v. Bassignani* (9th Cir. 2009) 575 F.3d 879, 885.) Indeed, he sent text messages to his acquaintance. The third factor thus weighs against finding Koerber in custody.

While Koerber was primarily in contact with the crisis negotiator, he was surrounded by many law enforcement officers. The fourth factor therefore supports a custody finding.

Koerber contends officers' demeanor was "extremely aggressive" and "confrontational." But the crisis negotiator posing the questions was not aggressive or confrontational. She asked fairly routine questions and asked if Koerber needed food, water, or her to contact someone. (See *Miranda*, 384 U.S. at p. 477 [noting its holding does not affect "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process"].) And while the crisis negotiator noted the blood outside the RV, she did not directly accuse Koerber of murder or press that fact as evidence of his guilt. Instead, she offered to provide him medical attention if he was, as he contended, the person bleeding. The fifth and sixth factors thus weigh against Koerber being in custody.

No one told Koerber he could leave. But Koerber voluntarily answered when the crisis negotiator called his cell phone and later the throw phone he

18

agreed to have placed in the RV.  The crisis negotiator confirmed Koerber did not have to answer her questions, and he could—and eventually did—voluntarily end the questioning by hanging up.  (*People v. Scott* (N.Y.App.Div. 2000) 269 A.D.2d 96, 98 ["defendant retained a degree of freedom inconsistent with a formal arrest in that he had the ability to terminate communications at any time by hanging up the telephone"].)  The seventh factor is neutral or weighs slightly against concluding Koerber was in custody.

Koerber admits he was not physically restrained during the crisis negotiator's questioning but contends law enforcement "controlled and dominated the environment."  Not so.  No officer was physically in the RV with Koerber, who was free to walk about the RV.  (*State v. Reuter* (Mo.Ct.App. 2021) 637 S.W.3d 478, 483.)  Threatening suicide by cop, Koerber had much more control over the situation than a typical suspect in custody.  (*Ibid.*)  The eighth factor thus weighs strongly against a finding Koerber was in custody.

The final two factors weigh in favor of a finding Koerber was in custody, as the questioning focused on Koerber—who, given his text messages, appreciated he was a suspect—and he was arrested once he left the RV.

Considering the totality of the circumstances, Koerber was not in custody for *Miranda* purposes.  While Koerber was surrounded by law enforcement officers and appreciated he would be arrested upon exiting the RV, he exercised significant control over the duration of his detention, was not physically restrained in any manner, was not in the physical presence of any officer, recognized he did not need to answer any questions he did not want to, and could voluntarily end the conversation at any time.  These

19

circumstances are not akin to those typical of a defendant under arrest. Given this conclusion, we need not address the applicability of the public safety exception or whether Koerber was interrogated.

E.

Fifth, Koerber contends his trial counsel was ineffective for failing to request a pinpoint instruction on aiding and abetting following a jury question. We discern no such error.

1.

Before deliberations, the jury was instructed on CALCRIM Nos. 252, 520, 521 (concerning murder), 400, and 401 (concerning aiding and abetting). The jury posed the following question during deliberations: "More clarification on murder one + murder two, how [ai]ding + abet[t]ing correspon[d]s."

The court and counsel discussed the question. Defense counsel expressed concern the jury was "confused about aiding and abetting versus accessory after the fact." She asked first that the aiding and abetting instruction be withdrawn, and in the alternative that the court instruct on accessory after the fact. The prosecution suggested either referring the jury back to the relevant instructions or asking the jury for clarification. It objected to providing an accessory after the fact instruction.

The court concluded, based on the defense's position that a third party killed the victim and the prosecution's argument that Koerber stabbed the victim with a knife to assist the killer, the aiding and abetting instruction was warranted. The court was also "not . . . comfortable" instructing on accessory after the fact because it wanted to avoid directing the verdict.

The response to the jury's question was: "The Court cannot provide any more information regarding Second Degree, First Degree Murder, and Aiding

20

and Abetting other than what is contained in those jury instructions." It reattached CALCRIM Nos. 252, 520, 521, 400, and 401 to the response.

2.

To establish ineffective assistance of counsel, Koerber must show both (1) "counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms," and (2) "there is a reasonable probability"—one that "undermine[s] confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.) There is a strong presumption counsel acted reasonably, so, "[o]n direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Koerber has not cleared this high hurdle on direct appeal because he has not shown counsel's representation was deficient. Defense counsel was not asked why she did not request a pinpoint instruction, and the record does not affirmatively show Koerber's trial counsel had no tactical purpose for failing to request such an instruction.

Rather, the record discloses a satisfactory explanation for counsel's actions. Namely, Koerber's counsel requested the aiding and abetting instruction be withdrawn entirely so the jury could find Koerber guilty of murder only as the direct perpetrator, which was the prosecution's main theory of the case. In the alternative, she requested instruction on accessory after the fact, the defense's theory of the case. Counsel reasonably may have believed that requesting further instruction on the middle ground of aiding

21

and abetting, which was no one's primary theory, would have served only to focus the jury on that theory and thus would have increased the likelihood of the jury convicting Koerber under it.  We therefore conclude Koerber's counsel acted within professional norms in approaching the jury's question.  Given this conclusion, we need not address prejudice.

Koerber thus fails to establish ineffective assistance of counsel on his direct appeal.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267 ["claims of ineffective assistance are often more appropriately litigated in a habeas corpus proceeding"].)

## F.

Finally, Koerber claims the above errors collectively deprived him of due process.  But we have concluded there is no series of errors to cumulate.  (*In re Reno* (2012) 55 Cal.4th 428, 483.)  This claim therefore fails.


## III.

We affirm.


CASTILLO, J.

WE CONCUR:


IRION, Acting P. J.


BUCHANAN, J.